UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHELLE HAGEN,

        Plaintiff,

v.                                            Case No. 19-cv-01863-PP

FOND DU LAC SCHOOL DISTRICT,

        Defendant.

## BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff Michelle Hagen (hereinafter "Plaintiff" or "Hagen") was employed by the Fond du Lac School District ("Defendant" or "District") starting in 2013. She first worked as an assistant principal at Fond du Lac High School for one year, then as the Principal at Fond du Lac High School for three years, and finally as the Principal at Roberts Elementary School for nearly two years. She voluntarily retired from the District in March 2019.

Plaintiff brings the present lawsuit alleging that she was discriminated against on account of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), as well as on account of her gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). More specifically, she claims that she was discriminated against on account of her age and gender when she was reassigned by the District Superintendent of Schools, James Sebert, from the position of Principal at Fond du Lac High School

to the position of Principal at Roberts Elementary School at the end of the 2016-2017 academic year. (ECF Doc. # 1, ¶¶ 8-13).

Superintendent Sebert had been responsible for hiring Hagen into the District as an assistant principal at the high school for the 2013-2014 school year, and he was also later responsible for promoting Hagen into the high school principal position for the 2014-2015 school year. (PFOF ¶¶ 14, 36, 38). However, by the end of the 2015-2016 school year, Sebert had developed serious concerns relating to Hagen's instructional leadership abilities, the culture and climate at the high school, as well as Hagen's ability to lead the high school forward. (PFOF ¶¶ 59-67, 72-89, 91-99). These concerns were first shared with Hagen in the spring of 2016, at which time Sebert asked her to develop an action plan for the 2016-2017 school year that would help her grow in three separate areas: (1) how she could grow as an instructional leader; (2) how she would build stronger relationships with staff members; and (3) how she would address the issue of timeliness in responding to students, teachers and families in terms of behavior, attendance and academic performance/intervention. (PFOF ¶¶ 59-67, 72-73). Despite receiving significant support and guidance from the administration during the 2016-2017 school-year to help her address these deficiencies, Hagen did not make the necessary improvements. (PFOF ¶¶ 77-89, 91-99). Sebert accordingly made the decision in May 2017 to transfer Hagen to an elementary school principal position for the 2017-2018 school year, which he believed would be a better fit based on Hagen's significant prior experience at the elementary school level. (PFOF ¶¶ 100-101).

On December 7, 2017, after she had been reassigned to Roberts Elementary School, and as a necessary condition precedent to filing the present lawsuit, Hagen filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of her age and gender. (PFOF ¶ 144). The EEOC charge was focused on Sebert's decision to

2

reassign her to Roberts Elementary School from the high school in May 2017, as well as the performance evaluation she was issued in the summer of 2017. (PFOF ¶¶ 144-145). The EEOC charge specifically indicated that the alleged discrimination occurred between the dates of May 1, 2017 and June 20, 2017. (Id.). Based on its investigation, the EEOC was unable to conclude that the information obtained established a violation of the applicable statutes. (PFOF ¶ 146). The EEOC accordingly issued a Dismissal and Notice of Rights on October 2, 2019, providing Hagen with the opportunity to file the present lawsuit within 90 days. (Id.).

In March 2019, while the EEOC charge was still pending, and after Hagen had been assigned as the Principal at Roberts Elementary School for almost two years, she made the decision to voluntarily retire from the District. (PFOF ¶¶ 134-140). The decision was based on a variety of personal factors, as well as some student safety concerns at the elementary school. (PFOF ¶¶ 135-139). Since resigning from the District in March 2019, Hagen has remained fully retired. In fact, since she retired from the District, she has engaged in no efforts to find alternative employment and she has not worked in any capacity. (PFOF ¶¶ 140-143). The present lawsuit was filed on December 19, 2019. (ECF Doc. # 1). Just like the EEOC charge, it is focused on the reassignment decision to the elementary school in the spring of 2017; it makes no reference to her decision to retire from the District in March 2019. (Id.).

Defendant maintains that summary judgment is warranted in that the undisputed material facts fail to establish that Sebert's decision to reassign Hagen to the elementary school was based on her age or her gender. Rather, the undisputed facts indicate that Sebert's decision to reassign Hagen was motived by his concerns related to the direction that the high school was heading and his belief that Hagen would be a better fit at the elementary school level. (PFOF ¶¶ 100-101). There is no indication that either Hagen's age or her gender was a factor in that decision. Indeed, Sebert had been

responsible for hiring Hagen and selected her for the High School Principal position just three years earlier. (PFOF ¶ 36). However, during her tenure as the high school principal, Sebert identified several concerns that led him to conclude that the high school needed new leadership and that Hagen would be a better fit at the elementary school. The authority of Sebert to reassign Hagen to another principal position was well within his authority as Superintendent, and it was an authority that he had exercised frequently during his tenure as Superintendent. (PFOF ¶¶ 8-10).

Plaintiff cannot establish a *prima face* case of either age or gender discrimination, and, even if she could somehow meet that burden, Defendant has articulated legitimate nondiscriminatory reasons for its actions. Plaintiff cannot meet her burden of proof to demonstrate that the District's legitimate nondiscriminatory reasons were pretextual.

In the alternative, Defendant moves the Court for summary judgment finding that Plaintiff shall be precluded from making any allegations or pursuing any claim for damages relating to her decision to voluntarily retire from the District in March 2019. Summary judgment is warranted on this claim because: (1) such allegations were not included in her EEOC charge; (2) such allegations were not included in her federal complaint; (3) her decision to retire was voluntary and would not constitute a constructive discharge under appliable law; and (4) she failed to mitigate her damages after she retired.

Based on the undisputed material facts presented in Defendant's Proposed Findings of Fact and based on the facts and arguments set forth herein, Defendant is entitled to summary judgment on all claims advanced by Plaintiff.

## SUMMARY JUDGEMENT STANDARD

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one which, under the applicable substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). While the court must construe all facts in the light most favorable to the non-moving party, Rule 56 of the Federal Rules of Civil Procedure mandate the entry of summary judgment, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-movant must show more than "some metaphysical doubt" regarding the facts). A mere "scintilla of evidence" in support of the non-movant's position is insufficient. *Delta Consulting Grp. v. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009). As here, when the record taken as a whole cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue and the case must be dismissed. *Matsushita Elec.*, 475 U.S. at 586.

## ARGUMENT

I.     PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF AGE DISCRIMINATION

A.   Elements of *prima facie* case of age discrimination

Plaintiff first claims that she was discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act (ADEA), by virtue of the fact that the reassignment decision was made by Sebert, who decided to replace her as the high school principal with Matt Steinbarth, who happened to be younger than Hagen. She also posits that the reassignment decision

was discriminatory because her replacement was paid a slightly higher salary as the high school principal than her. What she fails to recognize is that she similarly received a higher salary when she was hired as the high school principal than her predecessor – Jon Wiltzius, who also happened to be a younger male. (PFOF ¶¶ 26, 46). Moreover, after she was hired as the high school principal in 2014, Hagen was the highest paid principal in the District for the three years that she remained the high school principal. (PFOF ¶¶ 49, 57, 70). As will be discussed further below, Defendant is entitled to summary judgment on Plaintiff Hagen's age discrimination claim.

The ADEA prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Historically, a plaintiff could prove employment discrimination under the ADEA by using either the "direct method" or "indirect method" of proof. *Cerutti v. BASF Corp*., 349 F.3d 1055, 1060-61 (7th Cir. 2003) (citing *Cianci v. Pettibone Corp*., 152 F.3d 723, 727-28 (7th Cir. 1998)). Under the direct method of proof, the plaintiff could make her case by pointing to evidence directly showing that her employer subjected her to an adverse employment action on an impermissible discriminatory basis—here, on the basis of her age. *Id*. at 1061 (citing *Cianci*, 152 F.3d at 727).

Under the indirect method, the plaintiff has the initial burden of establishing a *prima facie* case by showing that (1) she is a member of a protected class; (2) she performed reasonably on the job in accord with her employer's legitimate expectations; (3) despite her reasonable performance, she was subjected to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably by the employer. *Ptasznik v. St. Joseph Hosp*., 464 F.3d 691, 696 (7th Cir. 2006). Even if the plaintiff could establish a *prima facie* case of age discrimination, the employer would still prevail if it could demonstrate that the employment

6

decision was based on a legitimate non-discriminatory basis. *Carson v. Lake County*, 865 F.3d 526, 533 (7th Cir. 2017). At all times, regardless of whether the plaintiff is proceeding under the direct or the indirect approach, the ultimate burden remains on the plaintiff to demonstrate that the employer would not have taken the alleged adverse employment action against the plaintiff were it not for plaintiff's membership in a protected class. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 n.4 (7th Cir. 2003); *Reeves v. Sandstrom Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

While the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Colbert*, 411 U.S. 792 (1973) still serves as a useful framework, the Seventh Circuit has moved somewhat away from these direct and indirect methods of proof. In *Ortiz*, the court noted that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself-or whether just the 'direct' evidence does so, or the 'indirect' evidence." See, e.g., *Ortiz v. Werner Enterprises*, 834 F.3d 760, 765 (7th Cir. 2016). The Court noted that the focus should rather be on the ultimate question of "[w]hether a reasonable juror could conclude that [the plaintiff] would have kept [her] job if [s]he had a different [age], and everything else had remained the same." *Id.* at 765-66.

It is also important to note that Plaintiff ultimately must prove by a preponderance of the evidence that her age was the 'but-for' cause of the challenged employer decision, not simply a 'motivating factor' in that action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009); *Serafinn v. Local 722 Int'l Bhd. of Teamsters*, 597 F.3d 908, 915 (7th Cir. 2010). The Court in *Gross* held that in the ADEA context, it is not enough to show that age was a motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred. *Gross*, 557 U.S. at 176-77; *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009). "In this respect, the ADEA is narrower than Title VII ... [because] Title VII protects against mixed-

7

motive discrimination." *Carson*, 865 F.3d at 532. Hagen cannot meet that heightened causation standard under the ADEA.

B. <u>Defendant is entitled to the benefit of the same actor inference</u>

Defendant is also entitled to the benefit of the same-actor inference in that Superintendent Sebert was the same individual who hired Hagen into the assistant high school principal position in 2013, promoted her into the high school principal position in 2014, and then later reassigned her to the elementary school principal position in 2017. This Circuit has generally embraced the same actor inference in both the ADEA and Title VII contexts. See *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1147 (7th Cir. 1994) (age discrimination under ADEA); *EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 152 (7th Cir. 1996) (racial discrimination under Title VII). Under this theory, where the same person does the hiring and firing of an individual, an inference arises that the firing did not result from an improper discriminatory motive. See *Martino*, 574 F.3d at 454-55. The theory is based on a common-sense psychological assumption, that "it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Proud v. Stone,* 945 F.2d 796 at 797 (4th Cir, 1991) (quoting Donohue & Seligman, *The Changing Nature of Employment Discrimination Litigation,* 43 Stan. L. Rev. 983, 1017 (1991)).

In the case at hand, Sebert made the decision to hire Hagen into the assistant principal position in 2013 and then promote her to the high school principal position in 2014, which was at the same time he hired Steinbarth as an elementary school principal. (PFOF ¶¶ 14, 36, 38, 40). Hagen acknowledges that Sebert's decision to hire her in 2013 and to promote her to the high school principal position in 2014 were not discriminatory actions. (PFOF ¶¶ 16, 39). The fact that it was Sebert who then decided three years later to reassign Hagen from a high school principal

position to an elementary school principal position, and, at the same time, transfer Steinbarth to the high school position, mitigates against any finding that the employment decisions were motivated by the respective ages of the administrators.[1]

### C. Plaintiff was not meeting the District's reasonable performance expectations

Turing now to the *prima facie* elements of Plaintiff's age discrimination claim. Other than meeting the first *prima facie* element of being over the age of 40, Plaintiff cannot meet the other three elements under the *McDonnell Douglas* standard.

With respect to meeting the District's reasonable performance expectations, the record demonstrates that Superintendent Sebert started developing serious performance concerns during Hagen's second year as the high school principal. (PFOF ¶¶ 59-67). The performance evaluation issued in June 2016, which was at the end of Hagen's second year as the high school principal, graded her as either "Developing" or "Needs Improvement" in three separate performance categories. (PFOF ¶ 60). The performance evaluation rated her as Needs Improvement in Leadership for Student Learning and noted that "[i]t is now time to focus on meaningful goal setting in the area of Literacy, Math and Behavior to improve academic outcomes at FHS." Sebert also noted that Hagen needed to become more adept at using data to drive educational instruction. (PFOF ¶ 61). She was also rated as Developing in School Climate, wherein it was noted that "the culture and climate survey data [was] troublesome." (PFOF ¶ 62). The school climate was an area that Hagen specifically understood needed to be improved when she took over as the high school principal. (PFOF ¶ 37). In the area of Human Resource Leadership, Sebert noted that she needed to work on a plan to address the expectations for timeliness of contact and/or follow-up with

---

[1] Indeed, it was common for Sebert to exercise his authority to transfer or reassign administrators within the District. During his tenure as the Superintendent, Sebert had exercised that authority on approximately twenty different occasions. (PFOF ¶ 10).

students, teachers, and families in terms of behavior, attendance, and academic performance/intervention. (PFOF ¶ 64). At that time the average response time to student or parent concerns/referrals coming into the central office was approximately 13 days, which even Hagen recognized as being "way too long." (PFOF ¶¶ 65-66).

Based on these concerns, Sebert believed that Hagen needed to grow as an administrator in several areas and requested that she develop a written action plan by August 15, 2016, in which she was to specifically address three areas in which growth or improvement was needed. (PFOF ¶ 67). The three specific growth areas identified by Sebert were: (1) how she would grow as an instructional leader; (2) how she could build stronger relationships with all staff members; and (3) how she would address the issue of timeliness in responding to students, teachers and families in terms of behavior, attendance and academic performance/intervention. (PFOF ¶ 73). Hagen spent the summer developing a plan entitled "Strategies for Growth," which she presented to Superintendent Sebert in August 2016 and which then went into effect for the 2016-2017 academic year. (PFOF ¶¶ 74-76).

During the 2016-2017 academic year, Sebert and Sharon Simon (Director of Human Resources) met with Hagen on a regular monthly basis to provide her with support and to discuss the areas for growth identified in Hagen's Strategies for Growth plan. (PFOF ¶¶ 82-84). During each of these meetings, Hagen would present an update on what she was doing to develop or grow in the deficient areas, and the participants would then have a conversation around those matters in an effort to support her. (PFOF ¶ 83). The District also provided additional resources to assist Hagen to grow in these targeted areas, which included hosting a FIRST Conference at the high school, which was a professional development opportunity during the summer, as well as bringing in the High Reliable School (HRS) framework and Dr. Philip Warrick to help with school

development.  (PFOF ¶ 77).  Additionally, based on concerns over instructional leadership, Sebert directed Danica Lewis, the Director of Curriculum and Pupil Services, to coordinate meetings at the high school in the summer and fall of 2016 to assist Hagen with professional development and building the capacity of the team leaders at the high school through professional learning communities (PLC).  (PFOF ¶ 78).  Lewis also worked with the administrative team at the high school to (1) design a program with the school's team leaders to help them build instructional leadership capacity to assist the team leader in leading their department teams and building a positive culture in the school; and (2) working on the implementation of standards-based instruction and grading at the high school.  (PFOF ¶ 79).  Sebert and Simon organized several meetings with Hagen and her high school leadership team during the summer and fall of 2016 that were focused on professional development in the areas of professional learning communities (PLC) and standards-based grading.  (PFOF ¶ 80).  This was the only time that Lewis had been asked by Superintendent Sebert to assist a principal in connection with developing instructional leadership.  (PFOF ¶ 81).

Released in April 2017, the District's school climate survey showed that the high school remained the lowest performing school on the climate survey.  (PFOF ¶¶ 87-88).  The high school had an average favorable rating ("strongly agree" or "nearly all") of only 13.73%, as compared to an average favorable rating of 56.24% for all elementary schools, 44.3% for all middle schools, and 43.43% for all schools within the district.  (PFOF ¶ 88).  While the high school had experienced some marginal improvement in some categories during Hagen's tenure, it was not at the level that Sebert felt was necessary.  (PFOF ¶ 92).  Sebert was also concerned with the consistent decline in the climate survey among student respondents during Hagen's three-year tenure as the principal.  (PFOF ¶ 93).

Based on Hagen's lack of instructional leadership capacity, as well as the poor culture and climate at the school, Sebert felt that it was in the best interest of the District to have some new leadership at the high school and to transition Hagen to the elementary school level. (PFOF ¶ 100). Sebert believed that Hagen could be more successful at the elementary school level and that it would be a "better fit." (PFOF ¶ 101). Indeed, all of Hagen's experience prior to joining the District had been at the elementary and middle school levels. (PFOF ¶ 17).

Accordingly, on May 24, 2017, Sebert met with Hagen and informed her that he was planning to reassign her to the principal position at Roberts Elementary School for the 2017-2018 school year. (PFOF ¶ 102). During the May 24, 2017, meeting, Sebert specifically referenced his concerns in the areas of instructional leadership, academic achievement and school culture/climate, and indicated that improvement in those areas was not happening as fast as he wanted to see. (PFOF ¶ 105). Moreover, although all other elementary school principals in the District worked under a 211-day contract, Sebert decided to maintain Hagen's 260-day contract for the 2017-2018 academic year so that she would not experience any reduction in her salary despite her new assignment. (PFOF ¶¶ 107-109).

All of this evidence refutes Plaintiff's contention that she was meeting the District's legitimate performance expectations and warrants the grant of summary judgment for Defendant on Plaintiff's age discrimination claim.

### D. Plaintiff did not suffer an adverse employment action

Moreover, Plaintiff did not suffer an actionable adverse employment action in connection with her reassignment to Roberts Elementary School for the 2017-2018 school year. The Superintendent had the authority to transfer and reassign administrators to different positions within the District, as needed. (PFOF ¶¶ 8-9). Sebert regularly made such reassignments and

when the reassignment was at the same level, it was not considered a demotion. (PFOF ¶¶ 10, 103). Additionally, Hagen's salary was not reduced because she was kept under the same contract for the 2017-2018 academic year, and her per diem rate was then subsequently maintained for the 2018-2019 academic year. (PFOF ¶¶ 107-109, 129-131). Hagen can therefore not demonstrate that the May 2017 reassignment amounted to an adverse employment action.

An adverse change in the terms and conditions of employment might include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. See *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ. Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)).

A reassignment from one position to the same position at a different school within the same district would not constitute an adverse employment action. This very question was addressed by another district court in *Cole v. Greater Clark County Schs.*, 2004 U.S. Dist. Lexis 2822 (S.D. Ind. 2004). Cole alleged that the failure to promote him from a middle school principal position to a high school principal position was an adverse employment action under Title VII because: (1) the high school salary scale was higher than the middle school salary scale; (2) the high school calendar was 17 days longer than the middle school calendar; (3) the educational environment was more focused on academics and less preoccupied with discipline issues; and (4) the position of high school principal was more prestigious than that of middle school principal. *Id.* at *27. The court rejected each of these arguments noting that Cole failed to establish that the failure to

13

promote him from a middle school principal position to a high school principal position amounted to an adverse employment action. *Id*. at *27-30.

Similarly, in *Salmon v. West Clark Community Sch.*, 64 F. Supp. 2d 850 (N.D. Ind. 1999), Salmon was reassigned from a position as a middle school teacher to an elementary school teaching position. While she made numerous arguments that the position was less prestigious and constituted an adverse action, the court noted that "[a]ll we have before us is Salmon's subjective and otherwise unexplained dislike for a full-time elementary teaching position, despite her years of uninterrupted experience at the elementary level." *Id*. at 868. The same factor holds true here for Hagen, as she was transferred from one principal position to another principal position within the District; and, not unlike Salmon, she had many more years of prior experience at the elementary school level.

Both of these decisions from this circuit are consistent with the notion that a lateral transfer or reassignment does not constitute an adverse employment action. See also *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 885-86 (7th Cir. 1989) (finding that principal's transfer to a different school where she shared the position with a co-principal was not an adverse employment action even though it subjectively caused her "humiliation," and noting that "public perceptions were not a term or condition of [plaintiff's] employment."); *Flaherty v. Gas Research Inst*., 31 F.3d 451, 457 (7th Cir. 1994) (finding that plaintiff failed to show that his transfer from a principal scientist to senior project manager constituted a materially adverse employment action; although the plaintiff's transfer resulted in his reporting to a former subordinate, a "bruised [] ego" represented plaintiff's perception of his transfer and therefore was insufficient to withstand the defendant's motion for summary judgment); *Crady*, 993 F.2d at 136 (affirming summary judgment on plaintiff's ADEA discrimination claim, finding that plaintiff's transfer from an assistant vice

president/management position at one bank branch to a loan officer/management position at another branch was not a materially adverse employment action; even though plaintiff's responsibilities changed, he failed to show that his new responsibilities were less significant than his previous duties).

Hagen may seek to argue that the change in assignment was an adverse employment action because the elementary school position was less prestigious and less visible than the high school position. This, however, is not sufficient to establish an adverse employment action. As the Seventh Circuit has noted, "the [ADEA] is not intended to prevent employers from changing the job responsibilities of their 40 to [70] year old employees. Neither is the Act intended to give 40 to [70] year old employees the right to walk out and sue their employer because they dislike their changed job responsibilities." *Spring*, 865 F.2d at 885 (quoting *Frazer v. KFC National Management Co.*, 491 F. Supp. 1099, 1105 (M.D. Ga. 1980)).

Moreover, with respect to compensation, by the time Hagen filed her EEOC charge in December 2017, she had not suffered any loss in pay or benefits. Indeed, rather than requiring Hagen to enter into a new contract for the 2017-2018 school year, Sebert simply amended Hagen's 2016-2017 contract to reflect the change in assignment to Roberts Elementary School. (PFOF ¶¶ 107-109). This resulted in her staying at the same salary level she had received as the high school principal, with no reduction in her number of work days or her total compensation. (Id.). Hagen accordingly did not suffer any loss in pay or benefits in connection with her reassignment to Roberts Elementary School for the 2017-2018 school year.

For the 2018-2019 school year, her second year at Roberts Elementary School, Hagen was placed on a 211-day contract, but her *per diem* rate was maintained at the same rate as the high

15

school principal rate. (PFOF ¶¶ 129-131). While her total compensation for the 2018-2019 school year decreased, she also worked fewer days. (Id.).

However, even if this reduction in total compensation was sufficient to establish an adverse employment action, Hagen's EEOC charge filed in December 2017 did not include any allegations relating to her salary to the 2018-2019 school year. (PFOF ¶ 144). In fact, she was still working under the prior contract under which she experienced no reduction in work days or total compensation. (PFOF ¶¶ 107-109). As a general rule, a plaintiff filing suit in federal court "may bring only those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005). A claim that she suffered a reduction in her total compensation for the 2018-2019 school year, which occurred more than six months after the filing of the EEOC charge, would not be reasonably related to or reasonably develop from the EEOC charge.[2]

Finally, the performance evaluation issued to Hagen in the summer of 2017 does not constitute an adverse employment action. As a general rule, negative performance reviews are only adverse employment actions if they "result in immediate and tangible consequences such as ineligibility for job benefits like promotion, transfer, or advantageous increases in responsibilities." *Nowak v. Int'l Truck and Engine Corp.*, 406 F. Supp. 2d 954, 970 (N.D. Ill. 2005). For example, in *Whittaker v. Northern Illinois University*, 424 F.3d 640 (7th Cir. 2005), the plaintiff had not suffered an adverse employment action where she simply received a negative evaluation, a written warning, and was placed on "proof status" (requiring her to produce proof of

---

[2] Even if Hagen had included this in her EEOC charge, Hagen cannot demonstrate that her reduced number of work days and corresponding reduced salary for the 2018-2019 school year amounted to an adverse employment action. See *Cole*, 2004 U.S. Dist. Lexis 2822, * 27-30.

sickness to receive sick leave). *Id.* at 648. In the case at hand, there was no negative consequence to Hagen's 2016-2017 performance review. In fact, by the time she received the 2016-2017 performance review, she had already been notified of her reassignment to Roberts Elementary School. (PFOF ¶¶ 94-105).

Based on the lateral nature of the reassignment from one principal position to another principal position, without any resulting loss in pay, Plaintiff cannot establish that she suffered an adverse employment action.

E. Plaintiff cannot identify a similarly situated administrator who was treated more favorably

As to the final element of the *McDonnell Douglas* burden-shifting framework, Plaintiff cannot identify any similarly situated individual who was substantially younger than Hagen who was treated more favorably. Plaintiff will likely seek to compare herself to Matt Steinbarth, the younger administrator who was reassigned to assume the role of high school principal after Hagen's reassignment to Roberts Elementary School. However, Hagen cannot demonstrate that Steinbarth was similarly situated to her in all material respects.

Similarly situated employees "must be directly comparable to the plaintiff in all material respects," but need not be identical in every conceivable way. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Typically, a plaintiff must at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847. Hagen cannot present sufficient evidence to establish that Steinbarth, who allegedly received more favorable treatment than her, was similarly situated with respect to conduct or job performance.

17

Steinbarth was a long-term employee with the District who started as a substitute teacher in the District in 1998. (PFOF ¶ 41). He was hired as a full-time teacher in 2000 and was subsequently promoted to the position of Assistant Principal at Woodworth Middle School for the 2013-2014 school year. (Id.). He then applied for and was hired into the position of Principal at Lakeshore Elementary School for the 2014-2015 school year, which was the same time that Hagen was hired as the High School Principal. (PFOF ¶ 40). During his three years as an elementary school principal, Steinbarth received favorable performance reviews and <u>never</u> received a rating of either "Needs Improvement" or "Developing" in any category. (PFOF ¶¶ 111-112). He was also never directed by Sebert to develop an action plan to address performance areas that were in need of development and/or growth. Additionally, Lakeshore Elementary School was one of the higher performing schools in the District. Indeed, according to the 2017 school climate survey, Lakeshore Elementary School received an overall favorable rating among the highest in the District. (PFOF ¶ 90). This had not always been the case, as the school culture and climate data from Lakeshore Elementary School improved significantly over the three years in which Steinbarth was its principal from 2014 to 2017. (PFOF ¶ 113). During that period of time, Steinbarth successfully moved Lakeshore Elementary School from a Blue-Ribbon School and the 83rd highest ranked elementary school in the state to the 13th highest ranking elementary school in Wisconsin. (PFOF ¶ 114).

In that Steinbarth was regarded by Sebert as a high performing administrator, who was never provided with any "Developing" "or Needs Improvement" performance marks by Sebert and was never ordered to prepare an action plan to address performance deficiencies, coupled with the fact that Lakeshore Elementary School scored extremely high on the school climate survey in 2016 and 2017, it cannot be said that Hagen and Steinbarth were similarly situated in all material

respects. All of these facts preclude a finding that Steinbarth was similarly situated to Hagen in all material respects.

Based on the record before this Court, Plaintiff has failed to establish that she was discriminated against on the basis of her age or that Superintendent Sebert's decision to reassign her from her position as the high school principal to an elementary school principal position was motivated by her age and that her age was the "but for" cause of the reassignment decision. She has also failed to show that the reassignment constituted an adverse employment action or that other similarly situated employees outside the protected class were treated more favorably. Summary judgment for Defendant is therefore warranted with respect to Plaintiff's age discrimination claim.

II. PLAINTIFF CANNOT ESTABLISH A *PRIMA FACE* CASE OF GENDER DISCRIMINATION

A. Elements of Title VII discrimination claim

Title VII's antidiscrimination provision makes it "unlawful ... for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the framework set forth in *Ortiz, supra*, a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected characteristic or activity caused an adverse employment action. *Id.* at 765. To meet this burden, Hagen may rely on the burden-shifting framework set forth in *McDonnell Douglas*, but that framework is just one way that the record can allow a reasonable jury to find sex discrimination. See *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation

marks omitted). This Court should therefore also consider all of the evidence in its entirety to determine whether the evidence would permit a reasonable factfinder to conclude that Hagen's gender caused her reassignment. *Ortiz*, 834 F.3d at 765; see also *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004-05 (7th Cir. 2018).

If a plaintiff seeks to prove discrimination pursuant to the *McDonnell Douglas* framework, a plaintiff can establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007) (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006)).

Defendant concedes that Hagen was female and therefore a member of a protected class. However, as was the case with her age discrimination claim, Hagen is unable to establish that she (1) was meeting the employer's legitimate performance expectations; (2) that she suffered an adverse employment action under Title VII; or (3) that the school district treated similarly situated male employees more favorably.

    B.   Hagen's performance did not meet her employer's legitimate expectations

Because the standard for meeting the District's reasonable expectations is the same under both the ADEA and Title VII, see *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 658 (7th Cir. 1991), Defendant hereby references and incorporates the same arguments advanced above with respect to her age claim.

C. Hagen was not subject to an adverse employment action

The standard for what constitutes an adverse employment action is also the same under both the ADEA and Title VII. *Henderson v. Shulkin,* 2020 U.S. Dist. Lexis 38109, *15 (N.D. Ill. 2020). As such, Defendant hereby references and incorporates the same arguments advanced above with respect to her age claim in connection with her gender discrimination claim.

D. Plaintiff cannot identify a similarly situated administrator who was treated more favorably

As to the final element of the *McDonnell Douglas* burden-shifting framework, Plaintiff cannot identify any similarly situated male administrator who was treated more favorably.

Plaintiff will likely again seek to compare herself to Steinbarth. However, as was the case with respect to his age claim, the difference in job performance and their resulting performance evaluations, as well as the fact that Lakeshore Elementary School scored much higher than the high school on the 2016 and 2017 climate surveys, precludes a finding that Steinbarth and Hagen were similarly situated in all material respects.

Plaintiff may also seek to compare herself to Tim Scottberg, who was as assistant principal at the high school who worked under Hagen for the 2016-2017 academic year, and was then selected for the principal position at the District's STEM school for the 2017-2018 academic year. (PFOF ¶¶ 119-124). Plaintiff will likely seek to argue that even though Scottberg had received a "Needs Improvement" on his last performance evaluation from Hagen, he was nevertheless promoted by Sebert. The decision to select Scottberg for the STEM position was not Sebert's decision alone, but was rather made by Sebert and the STEM Governance Board, as well as the interview team. (PFOF ¶ 121). That hiring decision was driven in large part by the fact that Scottberg had previously been involved in establishing a charter school for the Ripon School District. (PFOF ¶¶ 120-122). When the selection decision was made, Sebert was not aware that

21

Scottberg had received a less than effective rating from Hagen. (PFOF ¶ 123). Because Sebert was not aware of Scottberg's less than effective rating, this criterion cannot be relied upon to demonstrate discriminatory treatment.

Moreover, even though Scottberg had previously received one less than effective rating on a performance evaluation, he was not similarly situated to Hagen in all material respects. First, Scottberg was not subject to the same evaluator or supervisor, as it was Hagen who had supervised Scottberg and who issued the less than effective rating. *Coleman,* 667 F.3d at 846. Additionally, a single less than effective rating is a far cry from Hagen's performance ratings, which included multiple less than effective ratings over a period of two performance cycles, as well as a personal growth plan.

Based on the undisputed material facts presented, Defendant is also entitled to the grant of summary judgment with respect to Plaintiff's gender discrimination claim.

III.   PLAINTIFF CANNOT ADVANCE A CONSTRUCTIVE DISCHARGE CLAIM IN CONNECTION WITH HER VOLUNTARY RETIREMENT

A.   Plaintiff is precluded from advancing claims that were not included in her EEOC charge

Before bringing a Title VII or ADEA claim, a plaintiff must first exhaust her administrative remedies by filing a charge of discrimination with the EEOC and receiving a right to sue letter. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). After receiving a right to sue letter, a plaintiff filing suit in federal court "may bring only those claims that were included in her EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Geldon*, 414 F.3d at 819. This requirement has two purposes: first, it allows the EEOC and the employer an opportunity to settle the matter, and second, it ensures that

the employer has adequate notice of the conduct the employee is challenging. *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009).

While Plaintiff filed an EEOC charge prior to initiating this lawsuit, there is no dispute that Plaintiff failed to make any allegations in her EEOC charge relating to her retirement decision or assert that she was subject to a constructive discharge. (PFOF ¶¶ 144-145). Indeed, the EEOC charge was filed more than one year before she decided to retire from the District. Plaintiff may seek to argue that claims relating to her retirement decision (i.e., constructive discharge) are "like or reasonably" related to the allegations in her charge. However, a constructive discharge claim is not like or related to any of the allegations in Plaintiff's EEOC charge.

Claims are "like or reasonably related" when (1) "there is a reasonable relationship between the allegations in the charge and the claims in the complaint" and (2) "the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). The charge and complaint "must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Id.* at 501 (emphasis in original). A plaintiff cannot bring a new claim that is "inconsistent with" the claim in his EEOC charge, even if the new claim "involves the same parties and the same facts as the other claim." *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 526 (7th Cir. 2008). The fact that the charge and complaint generally assert the same kind of discrimination is not sufficient, without some factual relationship between them. *Cheek*, 31 F.3d at 501.

In the context of a constructive discharge claim, especially where the resignation decision occurred after the EEOC charge had been filed, a constructive discharge claim cannot be "like or reasonably related" to the EEOC charge. For instance, in *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293 (7th Cir. 2004), the Seventh Circuit held that EEOC charges alleging "racial

discrimination, retaliation, and harassment, [but] not constructive discharge," were an insufficient predicate for bringing a constructive discharge claim in federal court. *Id.* at 303 n.2; *see also Dixon v. Americall Grp., Inc.,* 390 F. Supp. 2d 788, 791 (C.D. Ill. 2005) ("when a plaintiff's EEOC charge alleges discrimination, but does not state that his decision to stop working is based on that discrimination, the charge does not support a constructive discharge claim").

A finding that a constructive discharge claim is not like or related to anything alleged in her EEOC charge is further supported by the timing of her charge. As was the case in *Herron,* the EEOC charges preceded the plaintiff's resignation; as the Seventh Circuit explained, the "delay between [the] EEOC complaint and [the plaintiff's] decision to leave was inconsistent with notice [in the EEOC charge] of constructive discharge." *Herron,* 388 F.3d at 303 n. 2; *see also Conner v. Ill. Dep't of Natural Res.,* 413 F.3d 675, 680 (7th Cir. 2005) (holding that discriminatory non-promotion claim could not have been exhausted in the EEOC charge where the non-promotion occurred one month after the charge was filed); *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir. 2000) (holding that discriminatory failure to rehire claim was not exhausted where the EEOC charge was filed prior to the plaintiff's applying for the position).

Consistent with her EEOC charge, Plaintiff's federal complaint likewise does not make any reference to her retirement decision and does not allege that such decision was discriminatory in violation of the ADEA or Title VII of the Civil Rights Act of 1964. She similarly made no reference to a constructive discharge. (PFOF ¶ 147). Nevertheless, Plaintiff retained a financial expert, Bruce Niendorf, Ph.D., who has issued a report in accordance with Fed. R. Civ. P. 26, wherein he opined that Plaintiff has sustained over $1,100,000 in economic damages as a result of her reassignment to Roberts Elementary School and her subsequent decision to retire from the school district in 2019. (PFOF ¶¶ 148-149).

Future economic damages are only potentially available to Plaintiff if she could establish that she was constructively discharged from the District, and since she did not make any such allegations in her EEOC charge or in the present complaint, Defendant requests that this Court make a finding that Plaintiff is precluded from advancing any claims relating to her voluntary retirement decision or to an alleged constructive discharge.

B. <u>The facts and circumstances of Plaintiff's decision to retire from the school district do not establish a constructive discharge</u>

By advancing a wage loss claim through her retained economic expert, Plaintiff appears to be taking the position that she was subject to a constructive discharge from the school district and would therefore be entitled to future wage loss from the date she retired until the age of 65. Even if such a claim was properly included in her EEOC charge and her present complaint, the factual circumstances of her retirement decision would not support a constructive discharge claim.

Constructive discharge occurs when a plaintiff shows that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable. See *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The Seventh Circuit recognizes two forms of constructive discharge, both of which require a showing that the work environment had become intolerable. *Id.* at 679. The first form is based on harassment and requires a plaintiff "to show working conditions even more egregious than that required for a hostile work environment claim." *Id.* The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign? *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004). The second form occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Chapin*, 621 F.3d at 679 (quoting *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)). This form of constructive discharge requires a showing that a firing was

25

"an imminent and inevitable event." *Chapin*, 621 F.3d at 680 (citing *Univ. of Chicago Hosps.*, 267 F.3d at 332).

In the present case, there was absolutely no indication that Plaintiff was subject to either category of a constructive discharge. Hagen testified that she voluntarily made the decision to retire from the school district because of some generalized concerns over perceived student safety issues and her concern that someone would get seriously hurt. She believed that if she resigned her employment, additional support would be provided by the administration. (PFOF ¶ 137). When she met with District representatives to discuss her retirement, she indicated that the decision was also related to her dad being older and her needing to take care of her aunt. (PFOF ¶ 138). Vague concerns over student safety and personal family care issues would clearly do not rise to the level of a constructive discharge. As for the second category, there is absolutely no evidence in the record that Plaintiff was facing termination if she had not retired.

Based on the undisputed facts presented, Plaintiff cannot maintain a constructive discharge claim.

### C. Plaintiff failed to mitigate her damages, if any.

A discharged plaintiff has a duty to exercise reasonable diligence in attempting to mitigate damages by finding comparable work. *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982); *Smith v. Great American Restaurants, Inc,* 969 F.2d 430, 438 (7th Cir. 1992). The general test of whether a plaintiff has failed to mitigate damages is two-pronged: the defendant must show that (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages; and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence. *Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir. 1989); *United States v.*

*City of Chicago*, 853 F.2d 572, 578 (7th Cir. 1988); *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994).

The plaintiff's burden to mitigate damages does not require success, but it does require an honest, good faith effort to locate comparable employment. *E.E.O.C. v. Ilona of Hungary, Inc.,* 97 F.3d 204, 216 (7th Cir.1996); *Smith*, 969 F.2d at 438-439. This means that a plaintiff may not spend an insufficient amount of time and effort looking for work. *Coleman v. Lane*, 949 F. Supp. 604, 608 (N. D. Ill. 1996) (discussing *Payne v. Security Sav. & Loan Ass'n, F.A.,* 924 F.2d 109, 111 (7th Cir. 1991) which upheld a reduction of plaintiff's back pay award for the two-year period during which his job search efforts consisted of spending merely "two or three days a month" and "[a] few hours a week, maybe a month" looking for employment, despite the fact that his job search was "earnest and extensive" in the first year following termination).

In the present case, Hagen engaged in no effort to find alternative employment. In fact, after she resigned, Hagen immediately requested retirement benefits from the Wisconsin Retirement System (WRS) and started receiving her pension benefits from MPS. (PFOF ¶ 141). After retiring from the District, which was almost two years after her reassignment to Roberts Elementary School, Hagen did not submit a single application for alternate employment; she did not seek employment with any prospective employer; and she even let her administrator's license issued by the State of Wisconsin expire. (PFOF ¶¶ 142-143).

Without any effort to find alternative employment, this Court can find, as a matter of law, that Plaintiff failed to mitigate her damages.

## CONCLUSION

Even if Plaintiff was unhappy about Sebert's decision to reassign her from the high school to the elementary school, the evidence presented in this case does not allow a reasonable jury to conclude

27

that his decision was motivated by either Plaintiff's age or her gender. The decision was rather precipitated by legitimate performance concerns, which Sebert had explained to Plaintiff and provided her with an opportunity to address before making the reassignment decision. Summary judgment is accordingly warranted on Plaintiff's claims under the ADEA and Title VII.

Additionally, Plaintiff must also be precluded from advancing a claim for future economic damages based on the fact that she voluntarily resigned under circumstances that would not give rise to a constrictive discharge; she failed to include a claim of constructive discharge in her EEOC charge or federal complaint; and she completely failed to mitigate her damages by seeking other employment after retiring from the District.

Dated at Milwaukee, Wisconsin this 30th day of July 2021.

Respectfully submitted,

**LINDNER & MARSACK, S.C.**

*/s/ Oyvind Wistrom*
Oyvind Wistrom
State Bar No. 1024964
411 E. Wisconsin Avenue
Suite 1800
Milwaukee, WI 53202-4498
Telephone: (414) 273-3910
Fax: (414) 298-9873
owistrom@lindner-marsack.com

*Attorneys for Defendant*

28