UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHELLE HAGEN,

                    Plaintiff,

                                              Case No. 19-cv-1863-pp

      v.

FOND DU LAC SCHOOL DISTRICT,

                    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 19) AND DISMISSING CASE

On December 19, 2019, the plaintiff filed a lawsuit against the defendant alleging discrimination based on her age and gender. Dkt. No. 1 at 1. The plaintiff says that she was discriminated against when the defendant's superintendent reassigned her from the principal position at a high school to the same position at an elementary school within the district and a younger male was assigned to her former position at the high school. Id. at ¶¶8, 10. The plaintiff states that the elementary school position was less prestigious and had a lower salary. Id. at ¶¶6, 11. The plaintiff claims violations of Title VII, 42 U.S.C. §2000e-2, and the Age Discrimination in Employment Act of 1967 (AEDA), 29 U.S.C. §621 *et seq.* Id. at ¶15.

On July 30, 2021, the defendant filed a motion for summary judgment as to both counts. Dkt. No. 19. The court will grant that motion.

## I. Facts

As an initial matter, the court notes that the plaintiff frequently objects to the defendant's proposed statements of fact without actually raising a factual dispute. See, e.g., dkt. no. 32 at ¶¶23, 24. In response to nearly half of the defendant's proposed statements of fact, the plaintiff's "objection" consisted of adding details or making arguments, not disputing the proposed facts. Whenever the plaintiff has failed to dispute the actual fact asserted in the proposed statement, the court has construed that proposed statement of fact as uncontested.

### A. The Parties and Other Players

The plaintiff is female and was born on October 19, 1962. Dkt. No. 32 at ¶1. The defendant is a school district that provides education to students from kindergarten to twelfth grade, with ten elementary schools, four middle schools and two high schools. Id. at ¶¶2-3. One of the high schools is an alternative high school for at-risk students and the other is Fond du Lac High School. Id. at ¶3. The district also includes two STEM schools, one for grades three through five and another for grades six through twelve. Id.

James Sebert was employed as the defendant's superintendent from July 1, 2009 until June 30, 2020. Id. at ¶4. Although Sebert reported to the school board, he had authority over administrative hiring and termination decisions for the defendant. Id. at ¶7. He also had the authority to transfer and reassign administrators and did so periodically. Id. at ¶¶8-9. The parties agree on a list

2

of nineteen reassignments of administrators that occurred during Sebert's tenure as superintendent. Id. at ¶10.

Prior to becoming the interim superintendent (when Sebert left) on July 1, 2020, Sharon Simon was employed as the defendant's Director of Human Resources. Id. at ¶5.

During the 2017-18 school year, the defendant had an administrative team that included all principals, all assistant principals, several cabinet level positions and the athletic director, David Michalkiewicz. Id. at ¶6. The cabinet-level positions were occupied by the Director of Business Services, Michael Gerlach; the Director of Curriculum, Instruction and Pupil Services, Danica Lewis; Simon; the Coordinator of Health, Safety, Attendance and Transportation, Marian Sheridan; and the Coordinator of Facility Services, John Williams. Id.

Matt Steinbarth is an employee of Fond du Lac School District. Id. at ¶41. He previously worked as a substitute teacher at an elementary school for one year; an eighth and ninth grade math teacher at a high school for two years and at a middle school for eleven years; and an assistant principal at a middle school for one year. Id.

B.    The Plaintiff's Hiring

The plaintiff applied for two positions with the defendant ahead of the 2013-14 school year: assistant principal of Fond Du Lac High School and assistant principal at Sabish Middle School. Id. at ¶11. The plaintiff's previous experience was with elementary and middle school students in the Milwaukee

Public School system (MPS). Id. at ¶17. She had roughly nine years of teaching experience and ten years working as an assistant principal or a principal. Id. at ¶18. In total, the plaintiff had about twenty-three years of experience with MPS. Dkt. No. 31 at ¶2.

The plaintiff participated in a formal interviewing process for the high school position, in which she interviewed with the former principal, several high school department heads and Simon. Dkt. No. 32 at ¶12. The school considered more than seventy candidates for the assistant principal position. Dkt. No. 31 at ¶3. The plaintiff had a second interview with Sebert and Simon, after which Sebert made the final decision and offered the plaintiff the assistant principal position. Dkt. No. 32 at ¶¶13-14. The plaintiff was fifty years old when she began working for the district on August 1, 2013. Id. at ¶15. The parties agree that "[the plaintiff] was not discriminated against by Sebert in connection with being hired into the Assistant Principal position in 2013." Id. at ¶16.

In her first year—2013-14—the plaintiff was paid an annual salary of $92,000, which was prorated to $83,188 based the fact that she worked 236 days that year, rather than the standard 260. Id. at ¶¶19-20. Her salary subsequently was adjusted by the school board to $84,027.33. Id. at ¶21. The plaintiff had taken a pay cut from her position with MPS, which she accepted to allow her to move her family to their lake home in Black Wolf. Id. at ¶22. The plaintiff commented during this period that "money [isn't] that important." Id. at ¶23.

4

During this first year, the plaintiff believed that there was "a lot of support" at the high school but felt that she struggled adjusting to the systems at her new school district. Id. at ¶24. She did not have a formal performance review that year. Id. at ¶25.

Near the end of the 2013-14 school year, the high school's principal declared that he would be resigning from his position at the end of the year. Id. at ¶27. At the time, the principal—who was born in 1969—was making $103,900. Id. at ¶26. The resulting vacant principal position was posted in the beginning of May 2014, with a salary range of between $97,000 and $115,000. Id. at ¶¶28-29. There also was a principal position open at Lakeshore Elementary School. Id. at ¶32. During the spring of 2014, the high school was experiencing "climate culture issues" that required improvement. Dkt. No. 31 at ¶7.

The plaintiff applied for both the high school and the elementary school principal positions, dkt. no. 32 at ¶33, and had an interview for each, dkt. no. 31 at ¶12. She was one of twenty-one applicants for the high school position and was the only applicant called back for a second-round interview. Dkt. No. 31 at ¶¶10, 13. The plaintiff had her first-round interview for the high school position with Sebert and other school team leaders. Dkt. No. 32 at ¶34. Based on the feedback sent to Sebert by the team leaders, it was determined that the plaintiff was the strongest candidate after the first round. Id. at ¶35. After her second-round interview, Sebert decided to offer the plaintiff the principal position at Fond du Lac High School, deeming it a "good fit" due for her

5

demonstrated ability to develop relationships during her year as assistant principal. Id. at ¶36; Dkt. No. 31 at ¶15. Sebert hoped this ability would help improve the school's climate and academic achievement, both of which were struggling. Id. The plaintiff was aware that the school climate at the high school was a concern and knew it was an area the administration wanted to improve. Dkt. No. 32 at ¶37. The decision to hire the plaintiff was impacted by the input from the interview team, but Sebert himself made the ultimate decision. Id. at ¶38. The plaintiff does not believe that discrimination played a role in Sebert's decision to hire her. Id. at ¶39.

While the plaintiff was being hired for the high school position, Sebert selected Matt Steinbarth—born in 1975—for the principal position at the elementary school. Id. at ¶40. Sebert believed that Steinbarth was a good fit for the position based on his prior experience as an assistant principal at Woodworth Elementary school and his strong history as a teacher and former team leader. Id. at ¶42. Originally, the interview team had recommended Barbara Dorn, a female, for the position. Dkt. No. 31 at ¶17. Based on Sebert's declaration, the defendant asserts that Sebert originally was part of the consensus group that wanted to hire Dorn, but that he learned Dorn had provided false information to the hiring team during her application and interview process. Id. (citing dkt. no. 29 at ¶¶2-3); dkt. no. 32 at ¶42. The defendant says that this finding during the background check persuaded Sebert and the team to look elsewhere, ultimately offering the elementary school position to Steinbarth. Dkt. No. 32 at ¶42. At the time of the hiring

6

decisions, Sebert reportedly told the plaintiff that he needed her at the high school and that "Lakeshore can run itself." Id. at ¶43. Yet, the elementary school remained in need of improvement in its culture and climate and its overall academic performance. Id. at ¶44.

C.    The Plaintiff's Tenure as High School Principal

In July 2014, the plaintiff entered into a two-year contract as the high school's principal. Id. at ¶45. Her starting salary was expected to be above $106,000 and her contract was renewable and eligible for an increase each year. Id. The school board later set the plaintiff's salary for 2014-15 at $107,060, making her the highest paid principal in the district for that year and paying her approximately $3,000 more than her younger, male predecessor. Id. at ¶¶46, 49. The contract gave the superintendent the authority to reassign the plaintiff to another position, stating that "[the plaintiff] is to perform duties of Principal at Fond du Lac High School or other duties for which he/she is licensed and qualified in the public schools of said district" and "[t]he specific administrative assignment will be determined by the Superintendent." Id. at ¶47. This authority was consistent with the School District Management Plan, which stated that "[t]he assignment and reassignment of administrators shall be the responsibility of the Superintendent of Schools." Id. at ¶48.

In June 2015, Sebert gave the plaintiff a performance evaluation for the 2014-15 school year. Id. at ¶50. The evaluation was based on the CESA 6 Effectiveness Model which relies on several data sources, including (1)

7

observations and site visits by the evaluator, (2) a documentation log completed by the administrator, (3) surveys and (4) a goal-setting plan. Id. at ¶51. The plaintiff was given an overall rating of "effective" for the 2014-15 school year and Sebert noted that she was a "breath of fresh air to Fond du Lac High school in all respects." Id. at ¶52. The plaintiff was rated as "distinguished" in the School Climate and Communication/Community Relations performance standards and "effective" in the other four standards. Dkt. No. 31 at ¶18. Sebert nonetheless noted that the plaintiff had several "areas for growth," including "[m]aintaining confidentiality in surveys of an anonymous nature" and engaging "even more deeply in instructional leadership and learning to move the [high school] forward." Dkt. No. 32 at ¶53. The first area of suggested improvement was related to an incident in which the plaintiff made comments to a teacher about the teacher's response on an anonymous survey. Id. at ¶54.

In June 2015, the plaintiff entered into another two-year contract as the high school principal. Id. at ¶55. The board set her salary for 2015-16 at $108,006, again making her the highest paid principal for that year. Id. at ¶¶56-57. The contract again specified that the superintendent had the authority to assign and reassign duties and positions. Id. at ¶58.

At the end of the 2015-16 school year, the plaintiff received another performance evaluation from Sebert. Id. at ¶59. The plaintiff and Sebert met to discuss the evaluation, during which Sebert shared concerns about the plaintiff's performance that resulted in Sebert rating the plaintiff as "Developing" or "Needs Improvement" in three areas. Id. at ¶60.

8

The plaintiff was rated as "Needs Improvement" in Leadership for Student Learning. Id. at ¶61. The evaluation noted that "[i]t is now time to focus on meaningful goal setting in the area of Literacy, Math and Behavior to improve academic outcomes at [the high school]" and said that the plaintiff needed to become more adept at "using data to drive educational instruction." Id.

The plaintiff was rated as "Developing" in School Climate and was told that "the culture and climate survey data [was] troublesome." Id. at ¶62. Sebert nonetheless indicated that he believed the plaintiff had the ability to improve in this area. Id. at ¶62.

The plaintiff also was rated as "Developing" in Human Resource Leadership. Id. at ¶64. Sebert noted in the evaluation that the plaintiff needed a plan to improve the timeliness of contact and/or follow-up with students, teachers and families with respect to behavior, attendance and academic performance/intervention. Id. At the time, the average response time for a concern coming into the high school's administrative office was over thirteen days, a period which the plaintiff agreed was "way too long." Id. at ¶¶65-66.

Otherwise, the plaintiff received a score of "effective" or "distinguished" in the other three areas. Dkt. No. 31 at ¶19. Sebert gave the plaintiff an overall rating of "effective," although Sebert noted that the plaintiff had room for growth in several areas. Dkt. No. 32 at ¶67. Sebert asked the plaintiff to develop a written plan by August 15, 2016 to address the three areas in which the he felt the plaintiff had underperformed. Id.

9

The plaintiff's growth plan was to include specific items and initiatives for implementation during the 2016-17 school year, with the goals of (1) improving as an instructional leader, (2) building stronger relationships with all staff members and (3) addressing the timeliness of the school's response to students, teachers and families regarding behavior, attendance and academic performance. Id. at ¶¶72-73. The plaintiff developed such a plan, titled "Strategies for Growth." Id. at ¶74. The parties emphasize that the plan "was not a formal performance improvement plan under CESA 6 Effectiveness Model." Id. at ¶75.

In June 2016, the plaintiff was given another two-year contract expiring June 30, 2018. Id. at ¶68. The school board set her salary for the 2016-17 school year at $109,086, again greater than the minimum required by her contract. Id. at ¶¶68-69. She remained the highest paid principal in the school district that year. Id. at ¶70. The terms of the contract again included the language stating that the superintendent had the authority to reassign the plaintiff to another position. Id. at ¶71.

In August 2016, ahead of the 2016-17 school year, the plaintiff met with Sebert and Simon to discuss her plan. Id. at ¶76. The plaintiff also was provided resources during the school year such as the ability to participate in a FIRST Conference at the high school, a professional development opportunity available to all administrators. Id. at ¶77. Additionally, Sebert brought in the High Reliable School framework and a professional, Dr. Philip Warrick, to assist with development at the high school. Id. Sebert also had Danica Lewis,

10

Director of Curriculum and Pupil Services, coordinate meetings over the summer and fall to assist the plaintiff with professional development and building the capacity of the high school's team leaders to lead their department teams and build and positive culture in the school; she also worked with the administrative team on implementing standards-based instruction and grading. Id. at ¶¶78-80. This work with Lewis was unique to the plaintiff; Sebert had not previously asked Lewis to assist any other principals with instructional leadership. Id. at ¶81. While all principals in the district had regular meetings with Sebert, dkt. no. 31 at ¶23, Sebert and Simon met with the plaintiff monthly to discuss her growth plan and progress and to see if she needed additional support, dkt. no. 32 at ¶¶82-84. The plaintiff's meetings about her growth plan were distinct and in addition to any other meetings. Dkt. No. 31 at ¶23. Sebert and Simon met with the plaintiff and her leadership team several times throughout the summer and all of 2016 to work on many of the same issues Lewis had addressed. Dkt. No. 32 at ¶80.

The defendant also conducted three surveys throughout the school year to better understand its individual schools' cultures and climates: a staff questionnaire, a parent questionnaire and a student questionnaire. Id. at ¶85. The defendant released the 2016-17 school year survey in April 2017. Id. at ¶86. The survey showed the percentages of staff, parents and students who responded to the fourteen questions with a response of "strongly agree" or "nearly all." Id. at ¶87. The average score for the high school was over thirty percentage points below the average score for the middle school and over forty

11

percentage points below the score for the elementary schools. Id. at ¶¶87-89. It showed that Lakeshore Elementary School, with Steinbarth as its principal, was one of the highest performers. Id. at ¶90. It showed that the high school had the lowest school climate scores out of all schools in the district that year. Id. at ¶63, 89.

Sebert was not satisfied with the modest improvements in the high school climate data (compared to previous years). Id. at ¶92. He also worried about the decline among student responses across the survey during the plaintiff's tenure. Id. at ¶93.

In June 2017, the plaintiff received a performance evaluation completed by Sebert covering the 2016-17 school year. Id. at ¶94. Sebert rated the plaintiff as "Developing" in both Leadership for Student Learning and School Climate. Id. at ¶95. Regarding Leadership for Student Learning, Sebert noted that "[b]ased on the preponderance of the evidence presented, [the plaintiff] demonstrated that she is inconsistent in supporting the success of each learner through collaborative implementation of a shared vision of teaching and learning that leads to student academic progress and school improvement." Id. at ¶96.

As to School Climate, Sebert noted, "[the plaintiff] demonstrated that she inconsistently fosters the success of all students in advocating, developing, nurturing and sustaining a safe, positive, and/or academically engaging school climate." Id. at ¶97. Sebert observed that while there was some growth in the

opinions of parents and teachers, the "student survey data show[ed a] consistent decline across the 14-question summary." Id. at ¶98.

The plaintiff was rated as "effective" in the Human Resources Leadership category. Id. at ¶99. Over the course of the school year, the average response time for student referrals had decreased from greater than thirteen days to less than two days. Id.

The parties disagree over whether the school climate surveys were part of the evaluation process. The plaintiff insists that they were not and that they do not reflect an administrator's performance. Dkt. No. 31 at ¶79 (citing dkt. no. 26-1 at 29-30; dkt. no 26-22). The defendant asserts that the plaintiff's understanding is based on inadmissible hearsay and otherwise is untrue. Id. According to the defendant, the climate evaluations were routinely used in the evaluation process and specifically referenced in the relevant standard "School Climate." Id. (citing dkt. nos. 26-13, 23-23, 23-31). It argues that surveys, generally, were one of the four components relied on in completing evaluations. Id. (citing dkt. no. 26-1 at 24-25; dkt. no. 26-20).

The plaintiff claims that when she was principal, the district focused on the "strongly agree" responses in evaluating the school climate, but asserts that when Steinbarth was made principal, the defendant reported both "strongly agree" and "agree" responses. Id. at ¶80 (citing dkt. no. 26-1 at 42-43). The defendant rejects the plaintiff's assertion, asserting that its surveys still summarized the "strongly agree" responses, and the language of the survey

13

calculation documents supports the defendant's assertion. Id.; Dkt. Nos. 33-1, 33-2, 33-3.

D.     Reassignment and Replacement

Due to his concerns over the plaintiff's leadership and the problems with the high school's culture and climate, Sebert decided it was in the best interest of the school to install a new principal. Dkt. No. 32 at ¶¶100-01. As part of this decision, Sebert decided to transfer the plaintiff to an elementary school within the district, which he thought would be "a better fit." Id.

Sebert intended to tell the plaintiff about the reassignment in May and sent her an email on May 23, 2017, moving the location of her Student Learning Objective review to the district office. Dkt. No. 31 at ¶¶39, 41. When the plaintiff met with Sebert the next day, Sebert began by thanking the plaintiff for her work on some specific issues and complimented her progress on the Student Learning Objective. Id. at ¶42. Sebert then told the plaintiff that she was being reassigned to Roberts Elementary School. Id.; Dkt. No. 32 at ¶102. He told the plaintiff that he believed she would be a better fit at the elementary school, although the parties dispute whether he provided reasons as to why. Dkt. No. 32 at ¶104, 106. Sebert stated in his deposition that he had "alluded" to the reasons, such as his concerns over her failure to improve the school's culture and climate, as well as her leadership and the academic achievement of the students. Dkt. No. 26-2 at 21. The plaintiff's own notes, which she says were taken after her meeting with Sebert, suggest that they spoke about "instructional leadership" and "climate" progress not improving at

14

a satisfying pace. Dkt. No. 23-32 at 1. Yet the plaintiff stated in her deposition that Sebert never offered any specific reasons for why she was a better fit at the elementary school level, explaining that her notes relating to leadership and climate were based on her own speculations. Dkt. No. 23-6 at 43-44. Simon can't remember if Sebert explained what he meant when he said the plaintiff was a better fit for the elementary school, although she says she did not hear him comment that it was based on a performance issue. Dkt. No. 31 at ¶45. Simon recalled that the plaintiff did not have notice of the reassignment and that she was upset by the news. Id. at ¶46. The plaintiff, feeling that she had not received a proper explanation, told Sebert that she might need a lawyer and Sebert offered her the rest of the day off because she looked upset. Id. at ¶47.

The plaintiff was hospitalized from May 24 to 26, 2017, during which time she was admitted to intensive care and received last rites from her parish priest. Id. at ¶85. The plaintiff says her hospitalization was a result of health issues resulting from the stress of her May 24 meeting with Sebert. Id. (citing dkt. no. 26-1 at 58-59). The defendant says that this is inadmissible hearsay because no medical evidence has been introduced. Id. Sebert called the plaintiff on May 30, 2017 and said that he hoped she didn't see her reassignment as him forcing her out or a disciplinary measure, again stating that it was a better fit. Id. at ¶86.

At the time of the plaintiff's reassignment, there were principal positions open at three elementary schools: Lakeshore, Evans and Roberts. Id. at ¶48. Lakeshore's demographics show that it is a school with low diversity and an

15

affluent student body. Id. at ¶49. Simon, who was the human resources director, does not know why the plaintiff was not offered the Lakeshore principal position. Id. at ¶50. Simon, who has worked for the defendant since 1989, is not aware of anyone other than the plaintiff being reassigned from a high school principal position to an elementary principal position. Id. at ¶51. The parties dispute whether a transfer from the principal position at the high school to a principal position at the elementary school was considered a demotion. Dkt. No. 32 at ¶103. Simon said in her deposition that such a reassignment would not be considered a demotion, dkt. no 26-3 at 23, but Torrie Rochon-Luft—another female principal formerly with the district—stated in her deposition that it would be a demotion due to the loss of prestige, dkt. no. 26-6 at 33-34. Sebert agreed that the high school principal position was "one of the most" visible positions in the school district, although the plaintiff asserts that it "is the most visible and potentially impactful principal role in the district." Dkt. No. 31 at ¶8.

Sebert amended the plaintiff's 2016-17 contract to reflect the plaintiff's change to the elementary school, but allowed the plaintiff to continue working on a 260-day high school contract during the 2017-18 year and to receive the same salary. Dkt. No. 32 at ¶¶108-09. This schedule made the plaintiff unique among elementary school principals. Id. at ¶109. For the 2018-19 school year, the plaintiff's contract was based on the 211-day school year at the elementary school and her salary minimum was $89,643. Id. at ¶129. The school board then set her salary at $91,720. Id. at ¶130. At this level, the plaintiff's *per diem*

rate did not decrease from the previous year; her salary was less due to the decrease in required work days, from 260 to 211. Id. at ¶131.

During this same period, Sebert decided to transfer Steinbarth, who had most recently been principal at Lakeshore Elementary School for three years, to the principal position at Fond du Lac High School, replacing the plaintiff. Id. at ¶110-11. Sebert believed Steinbarth to be the right fit for the position, crediting his past performance, his ability to build relationships and his strong instructional leadership skills. Dkt. No. 32 at ¶110. While he was principal at the elementary school, Steinbarth had received no ratings of "Needs Improvement" or "Developing" in his evaluations, and the culture and climate data for the school improved. Id. at ¶¶112-13. Lakeshore Elementary also moved from the eighty-third highest ranked elementary school in the state to the thirteenth. Id. at ¶114.

At no point was the position at the high school posted for other candidates, because Sebert believed he already had the right candidate in Steinbarth. Id. at ¶115. Steinbarth originally was offered a $110,000 salary at the high school for the 2017-18 school year but countered with a demand for $115,000, which Sebert approved. Id. at ¶116. This salary put Steinbarth at the top end of the salary range for the principal position. Id. It also meant that Steinbarth was making more than Simon. Dkt. No. 31 at ¶53.

Danica Lewis, a member of the district's cabinet, does not recall telling the plaintiff that her position as principal was in danger or that any team leader had a problem with the plaintiff. Dkt. No. 31 at ¶33. Lewis also has

17

stated that Sebert did not explain to her at the time why he was choosing Steinbarth. Id. at ¶32. The plaintiff contends that Simon found out about Steinbarth's reassignment to the high school only when Sebert made the decision, id. at ¶34, but this is not supported by the record. The record does not make clear the timing of Simon's conversation with Sebert about Steinbarth's reassignment. See Dkt. No. 26-3 at 12. Simon also says that she knew Steinbarth did not have experience at the high school level and that the plaintiff had almost completed her fourth year in the position. Dkt. No. 31 at ¶37. The plaintiff states that Simon confirmed that there was no process for appointing Steinbarth because the district's management plan allows the superintendent to transfer and reassign employees. Id. at ¶35.

When Steinbarth was offered the position, he was not told what would happen with the plaintiff due to the change. Id. at ¶38. He was given several weeks to accept and was not aware of what would happen with the position if he rejected the offer. Id. When he ultimately accepted the offer, he was not told what would happen with the plaintiff. Id. In May 2017, after accepting the offer, Steinbarth attended a conference with Lewis and Sebert. Id. at ¶40.

The defendant formally announced the plaintiff's and Steinbarth's reassignments on May 31, 2017. Dkt. No. 32 at ¶117. Although the announcement was made before the school year had ended and prior to the high school graduation ceremony, Sebert believed the timing was in the best interest of everyone involved. Id. at ¶118.

18

E.     Sebert's Lunch Group and Allegations of Favoritism

Superintendent Sebert had a lunch group, described by the plaintiff as "a group of three male staff members and one community member who made bets on sporting events whereby the loser would pay for lunch." Dkt. No. 31 at ¶25. The defendant contests that the group was limited to males, because Danica Lewis—a female—joined the group on one or two occasions. Id. (citing Dkt. No. 26-5 at 15). The plaintiff asserts that the lunch group did not include "persons over the age of 50." Id. at ¶26. On April 11, 2017, Sebert notified the lunch group that Steinbarth would be joining the group. Id. at ¶25. The email Sebert sent out to the group did not include any females or individuals over the age of fifty, although the defendant reiterates that the group was not always exclusively comprised of males. Id. at ¶26. It was during spring 2017 that Sebert offered the high school principal position to Steinbarth. Id. at ¶27.

Sebert evaluated all administrators. Id. at ¶60. While the athletic director, Dave Michalkiewicz, was not an administrator, Sebert also evaluated him. Id. at ¶61. As principal, the plaintiff completed the evaluation for Polly Miller, the fine arts director, even though Miller had districtwide responsibilities, as did Michalkiewicz. Id. at ¶62.

Only one other principal other than the plaintiff was required to develop a growth plan. Id. at ¶64. While principal at Sabish Middle School, Torrie Rochon-Luft was asked to develop a plan after receiving "needs improvement" ratings in her evaluation while getting an overall rating of "effective," though she never was placed on a plan of improvement, but was working on

19

"Strategies for Growth." Id. at ¶¶63, 65. Rochon-Luft was asked to develop a plan for areas of growth without evidence and felt that her voice was being taken away because of her gender. Id. at ¶64. Sebert met with Rochon-Luft monthly as part of the growth plan but did not otherwise provide her assistance. Id. at ¶66.

Rochon-Luft says that she observed Sebert favoring males, including John Colwin, Don Smith and Steinbarth, all of whom were assigned positions without interviews. Id. at ¶67. She says that she was reprimanded and had to attend counseling after emailing Colwin and Sebert together after a complaint was made by a family about Colwin's attempt to enter a student's home. Id. at ¶68. Rochon-Luft[1] says Sebert told her to "just keep her mouth shut" about the complaint. Id. She also says that while he was principal, Don Smith had an affair with a teacher under his supervision, but that instead of being fired Smith received a "big raise." Id. at ¶69 (citing Dkt. No. 26-6 at 29). The defendant maintains that Smith did not receive a big raise, but a relatively small raise in accordance with the usual year-to-year salary increase. Id. (citing Dkt. No. 30 at ¶3). The defendant adds that Sebert discussed the relationship issue with Smith and the matter was documented in Smith's personnel file. Id. (citing Dkt. No. 29 at ¶6). Smith had been reassigned to the STEM Academy prior to Sebert becoming aware of his relationship with the teacher. Id. (citing Dkt. No. 29 at ¶6).

---

[1] The plaintiff's proposed statements of fact use the name "Rochon-Smith," dkt. no. 31 at ¶68, but there is no one by that name in this case. The court assumes the plaintiff meant Rochon-Luft.

The plaintiff says that at one point she and athletic director Michalkiewicz submitted to Sebert the same evidence for their documentation logs but received different ratings from Sebert without evidence to account for the differences in scores. Id. at ¶75 (citing Dkt. No. 26-1 at 27-28). The defendant states that even if this is true, the CESA 6 Effectiveness Model performance evaluation used by Sebert relied on multiple data sources in addition to the logs and the differences in scores can be attributed to the three data sources other than the documentation log. Id. (citing Dkt. No. 26-1 at 24-25; Dkt. No. 23-20).

Another male, Tim Schipper, was the principal of Riverside Elementary, a school in the district that was identified by the state as a "Focus School." Id. at ¶76. This meant that the school was not performing up to the state's standards and that the state was required to step in to provide additional resources. Id. The plaintiff says that Schipper was "promoted" to a principal position at Woodworth Middle School in June 2018. Id. at ¶78. The defendant says that by 2018 when Schipper was reassigned, Riverside no longer was a focus school. Id. at ¶78 (citing Dkt. No. 29 at ¶9). The defendant also disputes the plaintiff's use of the term "promoted," arguing that it considers a reassignment from one principal position to another "simply a reassignment or lateral transfer." Id.

Around the same time as the plaintiff's reassignment, Tim Scottberg, an assistant principal at the high school, was selected as the district's STEM Academy's next principal. Dkt. No. 32 at ¶121. There is a dispute over whether Sebert made this decision on his own or the STEM Governance Board and

interview team collectively made the decision. Id. Regardless, Sebert favored the decision and believed Scottberg was perfect for the opportunity because of his past work getting a charter school off the ground in a different school district. Id. at ¶122. At his deposition, Sebert stated that he was unaware that the plaintiff had rated Scottberg as less than effective on one part of his 2016-17 performance evaluation. Id. at ¶123. The plaintiff objects to this assertion, asserting that she rated Scottberg "needs improvement and claims that "it was Scottberg's response time to student referrals that dragged down the response time for the entire High School." See id. In his first year as the STEM Academy's principal, Scottberg had an annual salary of $90,834, an increase from his $89,704 assistant principal salary at the high school. Id. at ¶124.

Prior to the 2015-16 school year, Sebert moved another male in the district, John Colwin (born 1962), from the principal position at Pier Elementary School to the assistant principal position at Sabish Middle School. Id. at ¶¶125, 127. Sebert made that decision due to concerns over Colwin's instructional leadership skills, giving Colwin the opportunity to transition to the assistant principal position to finish his career. Id. at ¶126. When presented with the option and encouraged to transition to the assistant principal position, Colvin accepted and was reassigned. Id. at ¶127.Colwin resigned on October 18, 2017. Id. at ¶128.

F.    Aftermath

After moving to Roberts Elementary School, the plaintiff was not required to write a growth plan and her monthly meetings with Sebert and Simon were

22

discontinued. Dkt. No. 31 at ¶87. In her second year at Roberts, the plaintiff was earning less than at least two other people in the district, Catherine Daniels[2] and Tim Scottberg, the principal at the STEM high school. Id. at ¶89. Scottberg was on a 211-day contract, like the plaintiff, but managed a school with fewer students. Id.

As of November 2017, the plaintiff became eligible to retire with full benefits. Dkt. No. 32 at ¶134. The plaintiff initially spoke with Simon to discuss her possible retirement on February 11, 2019. Id. at ¶135. Before then, no one in the district had talked to the plaintiff about retiring. Id. at ¶136. Roberts Elementary had an EBD (emotional and behavioral disorder) classroom where the district placed troubled children. Dkt. No. 31 at 96. As the school year went on, more students were being placed into the EBD classroom, which caused children to be hurt. Id. The plaintiff expressed concern over student safety issues she perceived at the school and her concern that someone could be seriously hurt. Dkt. No. 32 at ¶137. She believed that if she left, "they would get more support for the kids." Id. She requested such support in her meeting with Simon, but also added that "there [were] things that [were] going on with [her] dad being older, taking care of [her] aunt. [She was] going to have to leave." Id. at ¶138. In her deposition, the plaintiff blamed the lack of support around the EBD classroom for her decision to retire, saying, "I think if there would have been the support in the classroom, I wouldn't have retired at all." Dkt. No. 26-1 at 73.

---

[2] The plaintiff does not say who Catherine Daniels is or explain her role.

The plaintiff retired from the district on March 1, 2019 and immediately began receiving her retirement benefits from the Wisconsin Retirement system as well as her pension from Milwaukee Public Schools. Dkt. No. 32 at ¶¶140-41. The plaintiff never indicated that her decision to retire was in any way involuntary. Id. at ¶139.

Since retiring from the district, the plaintiff has not sought any employment opportunities and her educational and administrator's licenses have expired. Id. at ¶¶142-43. The plaintiff says that she has not looked for other employment, in part because of her understanding that after Rochon-Luft left the district and applied for jobs elsewhere, Sebert provided negative references; the plaintiff believed she would have the same problem. Dkt. No. 31 at ¶90. The defendant disputes this statement, arguing that it is immaterial, based on inadmissible hearsay and not credible. Id. The defendant asserts that Rochon-Luft was offered a job in a different school district, despite the allegedly negative reference. Id.

The plaintiff says that Steinbarth failed to timely submit his documentation log during his first year as principal at the high school, yet was rated "distinguished." Dkt. No. 31 at ¶88. This assertion comes from her deposition. See dkt. no. 26-1 at 65-66. The defendant disputes this allegation, stating that Steinbarth submitted the documentation log earlier than required; the evidence supports the defendant's argument. Dkt. No 31 at ¶88 (citing Dkt. No. 33-5 at 29).

24

On December 7, 2017, the plaintiff filed her EEOC charge alleging sex and age discrimination. Dkt. No. 32 at ¶144. Her charge was filed prior to her retirement and, therefore, did not mention any decision to retire or assert any claim for constructive discharge. Id. at ¶145. On October 2, 2019, the EEOC issued a Dismissal and Notice of Rights, stating that it was unable to conclude from the information obtained that there was a statutory violation. Id. at ¶146.

The federal complaint does not reference the plaintiff's retirement or assert a claim for constructive discharge, id. at ¶147, although it seeks an award "for her loss of back pay, future pay, and benefits," dkt. no. 1 at ¶19(E). The complaint also asserts that the plaintiff suffered an "involuntary future pay reduction of over $19,000 per year" because of the defendant's alleged discrimination. Id. at ¶18. The plaintiff has filed an expert report which estimates that the plaintiff suffered a future wage loss of $1,123,437 (later amended to $1,106,654) because of her reassignment to the elementary school. Id. at ¶¶148-49.

## II. Analysis

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Anderson, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

26

B.   The Parties' Arguments

1.   *Law Governing Title VII Claims*

The defendant moved for summary judgment on both of the plaintiff's claims, using the framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Dkt. No. 20 at 5, 19. Under the McDonnell Douglas framework, the plaintiff has the initial burden of establishing that she (1) belonged to a protected class; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was similarly situated to other employees who were not members of the protected class and were treated better. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the defendant articulates such a reason, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. Id. On summary judgment, the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age or sex.

The plaintiff's opposition brief suggested that the court consider the evidence as a whole under the Seventh Circuit's decision in Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016), but also offered using the McDonnell Douglas construct. Dkt. No. 24 at 4, 20, 22. In Ortiz, the Seventh Circuit clarified that the question in an employment discrimination case is

> simply whether the evidence would permit a reasonable factfinder to
> conclude that the plaintiff's race, ethnicity, sex, religion, or other

27

proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

Ortiz, 834 F.3d at 765.

In relation to the McDonnell Douglas burden-shifting framework, the

Seventh Circuit explained:

The burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), sometimes is referred to as an "indirect" means of proving employment discrimination. [The *Ortiz*] decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted into different piles, labeled "direct" and "indirect," that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole. That conclusion is consistent with *McDonnell Douglas* and its successors.

Id. at 766.

So—the McDonnell Douglas burden-shifting framework is one way of

proving employment discrimination under Title VII, but "a plaintiff need not

use the *McDonnell Douglas* framework after *Ortiz*. At summary judgment,

'[w]hat matters is whether [a plaintiff] presented enough evidence to allow the

jury to find in [his] favor.' *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1004 (7th Cir.

2020))." Igasaki v. Ill. Dep't of Fin. and Pro. Regul., 988 F.3d 948, 957-8 (7th

Cir. 2021). A plaintiff may seek to prove her Title VII claim via McDonnell

Douglas or by the totality of the evidence under Ortiz.

28

In its reply brief, the defendant argues that under either framework it is entitled to summary judgment because the plaintiff's allegations and evidence fail to make a *prima facie* case or present indirect or direct evidence to prove discrimination when viewed as a whole. See Dkt. No. 28 at 12.

> ### 2. *The Parties' Arguments Under McDonnell Douglas*
>
> #### a. Age Discrimination

The defendant argues that the plaintiff cannot establish a *prima facie* case of age discrimination because she cannot meet the heightened causation standard imposed by the ADEA—"but-for" cause. Dkt. No. 20 at 7. Citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009), the defendant states that in the ADEA context, it is not enough for the plaintiff to show that age was a motivating factor in her employer's adverse decision; she must prove that, "but for [her] age, the adverse action would not have occurred." Dkt. No. 20 at 7. The defendant also argues that it is "entitled to the benefit of the same-actor inference." Id. at 8. "Under this theory, where the same person does the hiring and firing of an individual, an inference arises that the firing did not result from an improper discriminatory motive." Id. (citing Martino v. MCI Commc'ns Servs., Inc., 574 F.3d 447, 455 (7th Cir. 2009)). The defendant argues that the same-actor inference applies because "Superintendent Sebert was the same individual who hired [the plaintiff] into the assistant high school principal position in 2013, promoted her into the high school principal position in 2014, and then later reassigned her to the elementary school principal position in 2017." Id.

29

With respect to proving the elements of a claim for age-discrimination, the defendant argues that the plaintiff can prove only the first *prima facie* element—that she was over forty years old. Id. at 9. According to the defendant, because she received suboptimal scores in her second- and third-year performance evaluations, the plaintiff was not meeting her employer's reasonable performance expectations. Id. The defendant focuses on the plaintiff's low scores regarding her leadership and the culture in the high school. Id. The defendant argues that because of her 2015-16 performance review, the plaintiff was instructed to develop a plan to improve several areas and that administrators met with her regularly in that regard. Id. at 10-11. The defendant contends that the plan did not improve the school's climate, because the high school remained the lowest performing school on the climate survey nearly a year later. Id. at 11.

The defendant discusses the plaintiff's 2016-17 performance review, arguing that negative performance reviews are not adverse employment actions unless they "result in immediate and tangible consequences such as ineligibility for job benefits like promotion, transfer, or advantageous increases in responsibilities." Id. at 16 (citing Nowak v. Int'l Truck and Engine Corp., 406 F. Supp. 2d 954, 970 (N.D. Ill 2005). The defendant argues that the plaintiff's 2016-17 review did not result in negative consequences because at the time she received the review, the plaintiff already had been notified of her reassignment to Roberts Elementary. Id. at 17.

30

According to the defendant, "[b]ased on [the plaintiff's] lack of instructional leadership capacity, as well as the poor culture and climate at the school, Sebert felt that it was in the best interest of the District to have some new leadership at the high school and to transition Hagen to the elementary school level." Id. at 12. The defendant asserts that all this evidence undermines the plaintiff's allegation that she was meeting the district's legitimate expectations. Id.

Moving to the next element, the defendant argues that the plaintiff did not suffer an adverse employment action. It asserts that the superintendent regularly reassigned and transferred administrators to different schools and positions within the district and that it was not considered a demotion when the reassignment was at the same level. Id. at 12-13. The defendant asserts that "[a] reassignment from one position to the same position at a different school within the same district would not constitute an adverse employment action." Id. at 13 (citing Cole v. Greater Clark Cty. Schs., Case No. IP 02-772, 2004 WL 350446, *10 (S.D. Ind. Jan. 16, 2004)). The defendant asserts that the plaintiff's salary was kept at the same level for the 2017-18 academic year and that "her per diem rate was then subsequently maintained for the 2018-2019 academic year." Id. at 13.

With respect to the final element of the McDonnell Douglas framework, the defendant argues that the plaintiff "cannot identify any similarly situated individual who was substantially younger than [the plaintiff] who was treated more favorably." Id. at 17. The defendant argues that a similarly situated

31

employee must have ". . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. (quoting Coleman v. Donohoe, 667 F.3d 835, 847 (7th Cir. 2012)). The defendant discusses Steinbarth's qualifications and work history, arguing that his positive employment reviews, the fact that he never was ordered to prepare an action plan and his school's high scores on the school climate surveys in 2016 and 2017 mean that Steinbarth cannot be deemed similarly situated to the plaintiff. Id. at 17-18.

The plaintiff emphasizes that the parties agree as to the first element of McDonnell Douglas. Dkt. No. 24 at 20. As to the second element, the plaintiff argues that she was meeting the defendant's legitimate expectations. Specifically, the plaintiff points to her overall "effective" scores on her performance evaluation at the time of her reassignment. Id. She insists that she was not told that her reassignment was performance-based, but simply that she was a "better fit" at the elementary school. Id. at 20-21. The plaintiff adopts arguments about her performance and the adverse nature of her reassignment from other portions of her brief. Id. at 21.

As to the last element, the plaintiff argues that Steinbarth is "well over 10 years younger" than she and that they "had the same supervisor . . .[,] were subject to the same District standards and engaged in similar work." Id. (citing Coleman, 667 F.3d at 847). The plaintiff disputes the defendant's assertion that she and Steinbarth were dissimilar in their performance scores. Id.

The defendant replies that the same actor inference weighs in its favor, repeating much of its initial brief. Dkt. No. 28 at 3. The defendant insists that the plaintiff was not meeting its reasonable expectations as of the 2015-16 school year because she had received scores of "developing" and "needs improvement" in three areas of her performance evaluation for that year. Id. at 3-4. The defendant says that Sebert gave the plaintiff an opportunity to develop her competence through the plaintiff's written plan for growth and her meetings with Sebert and Simon, to no avail. Id. at 4. The defendant disputes the plaintiff's assertions that she did not have notice of her performance issues. Id.

In response to the plaintiff's allegation that neither Simon nor Lewis knew about the plaintiff's alleged performance issues or the reassignment decision prior to the reassignment occurring, the defendant argues that although Lewis could not tell the plaintiff that her position was in jeopardy, Lewis and Simon nonetheless were aware of the problems the plaintiff was having with improving the school's culture. Id. at 4-5. The defendant says this was demonstrated through the monthly meetings Simon had with the plaintiff, conversations Simon had with Sebert, meetings Lewis had with the plaintiff and Lewis's knowledge beforehand that Sebert was going to offer the high school position to Steinbarth. Id. at 5. As to the plaintiff's overall "effective" rating, the defendant argues that "it is well established that positive statements on performance evaluations do not undercut critical comments or stated areas of improvement." Id. at 5-6 (citing Anderson v. Stauffer Chem. Co., 965 F.2d

33

397, 403 (7th Cir. 1992)). The defendant challenges the plaintiff's assertion that the calculation of climate survey data changed after Steinbarth became principal and other assertions about the validity of statements within her performance reviews and reason for reassignment. Id. at 6-7.

The defendant's reply reiterates much of its initial argument against reassignment being characterized as a demotion. Id. at 7. The defendant says that the plaintiff's subjective opinion that the reassignment was the equivalent of a demotion because of "prestige" does not make the reassignment an adverse action. Id. at 7-8 (citing Madlock v. WEC Energy Grp., Inc., 885 F.3d 465, 470-71 (7th Cir. 2018)).

The defendant also repeats its position on the change to the plaintiff's salary, alleging that the plaintiff did not assert this claim in her EEOC charge and thus has not exhausted her administrative remedies. Id. at 8-9. The defendant maintains that a pay change "is a discrete act that is not reasonably related to general discrimination or harassment allegations." Id. at 9 (citing Kruger v. Principi, 420 F. Supp. 2d 896, 907 (N.D. Ill. 2006)).

The defendant argues that the plaintiff failed to identify a similarly situated employee treated more favorably than she. Id. The defendant insists that the plaintiff pointed to only one younger employee—Steinbarth—and argues that Steinbarth is not similarly situated because he received better scores on his performance reviews. Id. at 9-10.

34

b.    Gender Discrimination

The defendant's argument as to gender discrimination mirrors its argument regarding age discrimination. The defendant repeats its previous arguments that the plaintiff was not meeting her employer's expectations and that she did not suffer an adverse employment action. Dkt. No. 20 at 20-21.

As to whether the plaintiff can identify a similarly situated employee, the defendant repeats its assertions about Steinbarth and also addresses Tim Scottberg. Id. at 21. The defendant says that Scottberg was not similarly situated: (1) he was subject to a different evaluator (it was the plaintiff who supervised and evaluated Scottberg); (2) Scottberg's single "Needs Improvement" rating is not comparable to the plaintiff's performance shortfalls over a period of two performance cycles; and (3) Sebert was unaware of this rating prior to offering Scottberg the position. Id. at 22. The defendant also argues that the decision to select Scottberg for the STEM position was not Sebert's alone; the decision was made in conjunction with the STEM Governance Board and the interview team. Id. at 21.

The plaintiff's response follows the McDonnell Douglas framework. Dkt. No. 24 at 22. She begins by "reiterating that she was meeting the District's legitimate expectations and did suffer an adverse action." Id. at 22. The plaintiff extends several of her other arguments (discussed below) and addresses whether there is a similarly situated comparator whom the defendant treated better. Id. at 23. She asserts that "'[w]hether a comparator is similarly situated is "usually a question for the fact-finder," and summary judgment is

35

appropriate only when "no reasonable fact-finder could find that [the] plaintiff[] [has] met [her] burden on this issue.""" Id. (quoting Coleman, 667 F.3d at 846). She says that she and Steinbarth shared the same supervisor, were subject to the same conduct and engaged in the same general activities. Id. But she says that Steinbarth was included in a "good ole boy" lunch group with Sebert and given a higher salary when he took the high school principal position. Id. at 23-24. The plaintiff argues that she "has shown background circumstances that demonstrate Sebert has a reason or inclination to discriminate invidiously against females or evidence that there is something 'fishy' about the facts at hand." Id. at 24 (citing Phelan v. City of Chicago, 347 F.3d 679, 684 (7th Cir. 2003)). She says that evidence of this "fishiness" can include the fact that the male selected was less qualified than the female. Id. (citing Preston v. Wis. Health Fund, 397 F.3d 539, 542 (7th Cir. 2005)).

The plaintiff also argues that another male employee, John Colwin, was given better treatment than she. Id. She says that "Colwin was provided the opportunity from Sebert to leave a Principal position and accept an Assistant Principal position to finish his career with the District which he was happy to do." Id. The plaintiff argues that Colwin was similarly situated and treated more favorably because he was "subject to termination but remained in an administrative position" as assistant principal. Id. at 24-25.

The plaintiff also lists Tim Scottberg and Tim Schipper, both male, as similarly situated employees to whom the defendant gave better treatment. Id. at 25. She says that Sebert promoted both men—Scottberg to the STEM school

36

principal position and Schipper to the principal position at Woodworth Middle School. Id.

The defendant asserts that the plaintiff has failed to point to any similarly situated male employees treated more favorably. Dkt. No. 28 at 10. The defendant states that the plaintiff was treated *more* favorably than Colwin, who was reassigned from a principal position to an assistant principal position, while the plaintiff was allowed to remain at the "same Principal-level, just at a different school." Id. Regarding Scottberg, the defendant argues again that Sebert did not know about the "Needs Improvement" rating on Scottberg's performance evaluation and that Sebert and the interview panel selected Scottberg because of his experience in starting a charter school for another district. Id. at 11. The defendant alleges that the plaintiff was treated more favorably that Scottberg because the salary he was paid as principal in 2016-17 was less than what the plaintiff had made when she was hired as assistant principal at the high school three years earlier. Id. The defendant disputes the plaintiff's assertion that Schipper was treated more favorably than she by restating its position that a principal-to-principal reassignment is a lateral reassignment and that Sebert made the decision because "Schipper had spent his teaching career at Woodworth and had previously been Assistant Principal at Woodworth from 2007 to 2010, where he had excelled and was beloved." Id. In addition, the defendant notes that at the time of the reassignment, Riverside Elementary had made "the necessary improvements under Schipper's

37

leadership and was no longer designated by [the Department of Public Instruction] as a Focus School." Id.

### 3. *Arguments on Evidence as a Whole*

The plaintiff argues that the facts should be viewed as a whole, as offered under Ortiz. 834 F.3d at 765. Dkt. No. 24 at 3-4. In this section of her brief, she combines her claims of age and gender discrimination.

The plaintiff begins by arguing that the defendant incorrectly relies on the same actor inference. Id. at 5. She insists that "the District ignores that such a presumption is simply evidence and should not be accorded any presumptive value as it is the jury's function to determine whether that is the case." Id. (citing Martino, 574 F.3d at 455; Petts v. Rockledge Furniture, LLC., 534 F.3d 715, 724-25 (7th Cir. 2008); Filar v. Bd. of Educ. of City of Chi., 526 F.3d 1054, 1065 n.4 (7th Cir. 2008)). The plaintiff explains the circumstances of her application and interview process with Sebert. Id. at 5-6. She asserts that Sebert was the one who decided to hire Steinbarth—despite the fact that the interview team had chosen a female—for the elementary school position open at the same time and for which the plaintiff had interviewed. Id. at 6-7. The plaintiff discusses the "lunch club" organized by Sebert, which, she asserts, included only men. Id. at 7. The plaintiff contends that Sebert invited Steinbarth to join the group during the same period in which he discussed the high school principal position with Steinbarth. Id. The plaintiff calls this group a "good ole boys" club and states that Sebert gave the men in the group

38

preferential treatment. Id. The plaintiff then spends several pages discussing the preferential treatment she believes Sebert gave to different men. Id. at 7-10.

The plaintiff next argues that her reassignment was not performance-based. Id. at 10. She argues that despite the defendant's assertion that her reassignment *was* performance-based, that was not what she was told at the time of Sebert's decision; she adds that "[i]n this respect, if the stated reason was not the actual one, it is a pretext even if it had some basis in fact that might have induced some employers to take the adverse action taken against the plaintiff." Id. (citing Forrester v. Rauland-Borg Corp., 453 F.3d 416, 419 (7th Cir. 2006)). The plaintiff walks through her performance history as the high school principal, showing both good and bad feedback, depending on the year. Id. at 10-11.

Finally, the plaintiff argues that her reassignment was a demotion. Id. at 17. She argues that "[a]s a matter of law, a demotion is evidenced by a decrease in wage or salary, a less distinguished title, a loss of material benefits, significantly diminished responsibilities or other indices that might be unique to a particular situation." Id. (citing Crady v. Liberty Nat'l Bank and Trust Co. of Ind., 993 F.3d 132, 136 (7th Cir. 1993)). The plaintiff says that the high school position was "the most visible and potentially impactful principal role in the District." Id. She says that "Rochon-Luft who was a Middle School Principal in the District stated that such a move was a demotion as there is prestige in being the High School Principal and every administrator in the District would feel a move from the High School Principal position to an Elementary School

39

Principal position would be a demotion." Id. at 17-18. She maintains that Sebert's phone call after her hospitalization, telling her that he "hoped she didn't see this move as him forcing her out or that it was disciplinary," is evidence that "Sebert could understand a reasonable person would see this move as a demotion." Id. at 18. The plaintiff argues that the circumstances are essential when considering whether a specific reassignment is materially adverse. Id. at 18 (citing Deleon v. Kalamazoo Cnty. Road Comm'n, 739 F.3d 914, 919 (6th Cir. 2014)).

The plaintiff argues that her annual salary dropped by roughly $19,000 with the reassignment, which also adversely affected her benefits by reducing the contributions made to her retirement plan and to Social Security. Id. at 18-19. She disputes the defendant's allegation that she has not exhausted her administrative remedies with regard to the salary reduction, arguing that the loss of pay is reasonably related to the charges in her EEOC claim. Id. at 19-20.

Although the defendant did not frame its argument in this manner in its original brief, it responds to the plaintiff's "wholistic" argument in its reply. The defendant argues that the plaintiff is cherry-picking facts when discussing the lunch group because a female, Danica Lewis, was known to have participated in the group. Dkt. No. 28 at 12. It asserts that another participant did not even work for the district and that the plaintiff failed to provide any evidence that the group was work-related, rather than social. Id. It also states that

40

Michalkiewicz was not given any special treatment due to his participation in the group. Id.

The defendant then addresses the plaintiff's assertions relating to Smith and Barkovich (the teacher with whom Smith had an affair). Id. at 13. The defendant says that the plaintiff misstated facts relating to Smith's pay, that Sebert did not learn of the relationship until over a year later (after Smith had been reassigned) and that Sebert addressed the affair with Smith and documented it in Smith's personnel file. Id. at 13. The defendant says that it is confused by the plaintiff's inclusion of Barkovich, who the plaintiff alleges was awarded a principal position with no prior administrative experience. Id. The defendant argues that this fact "obviously directly undercuts Plaintiff's gender discrimination claim." Id.

The defendant then repeats several of its arguments about Steinbarth's treatment and addresses the plaintiff's concerns over his salary upon reassignment to the high school. Id. at 13-14. It also asserts that the plaintiff misunderstands the timeline and due dates of the documentation log Steinbarth timely submitted for evaluation. Id.

C.    Analysis—Age Discrimination

The Age Discrimination in Employment Act "prohibits an employer from 'discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age.' 29 U.S.C. § 623(a)(1)." Igasaki, 988 F.3d at 960. Although Title VII and ADEA causation standards are not necessarily the same, "both statutes

41

nevertheless share similar analytical approaches—*McDonnell Douglas* and *Ortiz*—at summary judgment." Id. (citing Carson v. Lake Cnty., Ind., 865 F.3d 526, 532 (7th Cir. 2017)). As the court explained when discussing the Ortiz decision, the plaintiff can rely on direct or circumstantial (so-called "indirect") evidence of causation  Joll v. Valparaiso Cmty. Schs., 953 F.3d 923, 929 (7th Cir. 2020) (citing Ortiz, 834 F.3d at 764-54). Circumstantial evidence includes ambiguous or suggestive comments or conduct, better treatment of people similarly situated but for the protected characteristic and dishonest employer justifications for disparate treatment. Id  (citing Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)).

"[T]he relevant standard under the ADEA is whether age was the 'but for' cause of the allegedly discriminatory employment action." Igasaki, 988 F.3d at 960 (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009)). "A plaintiff may prove but-for causation either 'by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age' or by invoking" the McDonnell Douglas framework. Marnocha v. St. Vincent Hosp. and Health Care Ctr., Inc., 986 F.3d 711, 918 (7th Cir. 2021) (citing Carson, 865 F.3d at 532-33).

      1.    *McDonnell Douglas Framework*

The defendant does not dispute that the plaintiff is a member of a protected class, which means that she has proven the first element of the McDonnell Douglas *prima facie* case. It argues, however, that the evidence does not prove the other three elements of the McDonnell Douglas *prima facie* case.

42

And it argues that there is a presumption against discrimination because Sebert both hired and reassigned the plaintiff to and from the principal position at the high school—the "same actor inference."

a.    Same Actor Inference

The same actor inference says that a person responsible for hiring an individual is "unlikely . . . to suddenly develop a strong bias" against that individual. Martino, 574 F.3d at 454-55. The inference presumes that if someone hires an applicant, that same person is unlikely to be acting with discriminatory animus if he or she takes adverse employment conduct against that applicant later on, "particularly when we're talking about a relatively short time frame." Id. The Seventh Circuit has expressed concerns about relying on the same actor inference to "carry a moving party over the summary judgment hurdle." Petts, 534 F.3d at 724; see also Filar, 526 F.3d at 1065 n.4. Nevertheless, courts may use the inference a commonsense manner, so long as they do "not place 'too strong a reliance' on the inference of nondiscrimination." Martino, 574 F.3d at 455 (citing Filar, 526 F.3d at 1065 n.4).

Sebert made the decision to hire the plaintiff to the assistant principal position at Fond du Lac High School in 2013, when she was fifty years old. Dkt. No. 32 at ¶¶14-15. He chose the plaintiff out of a pool of seventy candidates. Dkt. No. 31 at ¶3. The parties agree that Sebert did not discriminate against the plaintiff when he made the decision to hire her. Dkt. No. 32 at ¶16. Sebert also made the final decision and extended the offer to the plaintiff to work as the high school principal. Id. at ¶¶36, 38. The three years

43

between Sebert's assignment of the plaintiff to the high school principal position and his reassignment of her to the middle school principal supports a finding of the same actor inference. <u>Compare</u> <u>Filar</u>, 526 F.3d at 1065 n.4 (suggesting seven years weakens the inference) and <u>Martino</u>, 574 F.3d at 454 (suggesting two years is sufficient to raise the inference). But the inference is not controlling; the plaintiff is correct that it is a single factor for the court to consider in a commonsense fashion.

b.    Employer's Legitimate Expectations

There is evidence that the plaintiff was not meeting the defendant's legitimate expectations. The defendant has provided evidence that Sebert was not satisfied with the plaintiff's work. The plaintiff received all effective or distinguished ratings in her 2014-15 evaluation, dkt. no. 23-19, but saw several developing/needs improvement ratings in 2015-16 and 2016-17, dkt. nos. 23-23, 23-31. Sebert included areas for growth in each of his evaluations of the plaintiff. While the critical feedback after her first year addressed small, specific items, <u>see</u> dkt. no. 23-19, Sebert's feedback after the latter two years reflected overall problems with the plaintiff's performance, <u>see</u> dkt. no. 23-23; dkt. no. 23-31.

After the 2015-16 school year, the plaintiff received developing/needs improvement ratings in Leadership for Student Learning, School Climate and Human Resources Leadership. Dkt. No. 23-23 at 1-4. These evaluations were above "unacceptable," but were tied to specific recommendations in areas in which Sebert wanted to see the plaintiff improve. <u>Id.</u> Sebert also asked that

44

that summer, the plaintiff to develop a plan for growth to address these three areas. Id. at 8; dkt. no. 26-1 at 45.

Sebert, Simon and Lewis each worked with the plaintiff over the 2016-17 school year in support of the plaintiff's plan for growth. Dkt. No. 26-2 at 17, 21. The defendant provided opportunities for professional development for all its administrators, including the plaintiff, that related to the plaintiff's areas for growth. Id. at 17. Despite that assistance, the plaintiff's evaluation scores for the 2016-17 school year were not much better. For that school year, Sebert gave the plaintiff developing/needs improvement ratings in two areas in which she had received identical ratings the year before. Dkt. No. 23-31 at 1-6. The plaintiff improved her score only in a single category, Human Resources Leadership. Id. at 7-8. And the high school ranked as the lowest in the district in nearly every category of the school climate surveys. Dkt. No. 23-24 at 1-16. The plaintiff had been given the high school principal position, in part, with the goal of improving the school climate. Dkt. No. 26-2 at 8. But the school experienced no meaningful improvement in scores on the defendant's climate surveys. Dkt. No. 23-24 at 1-16.

On the other hand, there is some evidence indicating that the plaintiff was meeting the defendant's expectations. She consistently was given an overall rating of "effective" in each of her three years as principal at the high school. Dkt. Nos. 23-19 at 6 (2014-15), 23-23 at 8 (2015-16), 23-31 at 14 (2016-17). She received all effective or greater ratings after her first year in the position, and three or more effective ratings (out of six) in each of her second

45

and third years on the job. Id. Although her plan for growth was akin to a performance improvement plan, the plan was informal. See dkt. nos. 26-3 at 12, dkt. no. 26-2 at 16-17. The plaintiff was offered and accepted new two-year contracts with salary increases at the end her first two school years. Dkt. Nos. 23-21 (2015), 23-25 (2016). Sebert also reassured the plaintiff after the 2015-16 school year that he had faith in her ability to improve the school climate. Dkt. No. 23-23 at 3.

Although there was reason to believe the plaintiff was struggling in her position, given the informal nature of the performance plan and the plaintiff's overall "effective" rating during all three years of her employment at the high school, a reasonable jury could decide that the plaintiff was meeting the defendant's legitimate expectations.

         c.      Adverse Employment Action

"A plaintiff must show that [s]he suffered a 'materially adverse employment action,' not merely a minor or even trivial one." Kurtzhals v. County of Dunn, 969 F.3d 725, 729 (7th Cir. 2020). "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities." Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 780 (7th Cir. 2007).

The plaintiff maintains that her involuntary reassignment from the high school to the elementary school was a demotion and therefore an adverse employment action. She has presented evidence in the form of deposition testimony from Michelle Rochon-Luft that the nature of the plaintiff's

reassignment was a demotion. Dkt. No. 26-6 at 33-34. Rochon-Luft credits her opinion to the loss of prestige allegedly incurred by moving from the high school to the elementary school level, as well as the loss in salary. Id. Simon, on the other hand, testified at deposition that the reassignment keeping the plaintiff in a principal position was not a demotion. Dkt. No. 26-3 at 23.

The defendant points to several cases in support of its argument that the plaintiff's reassignment was not an adverse employment action. Dkt. No. 20 at 13-15. While the cases address the "prestige" issue, none address a reduction in pay. The defendant first cites to Cole, 2004 WL 350446, in which the plaintiff argued that he suffered a Title VII failure to promote violation when the district failed to promote him from a middle school principal position to a high school principal position. The plaintiff argued, among other things, that the high school position was more prestigious than the middle school position. Id. at *10. The district court determined that the plaintiff had "offered no evidence, other than his self-serving conclusion, that the position of high school principal is more prestigious than that of middle school principal." Id.

The defendant also cites Salmon v. West Clark Cmty. Schs., 64 F. Supp. 2d 850 (S.D. Ind. 1999), decided by the same court. In response to the Salmon plaintiff's argument that transfer from middle to elementary school involved a loss of prestige, the court concluded that when "the teacher is transferred to the same level position at which she amassed the majority of her teaching experience, that teacher must exert some effort to demonstrate how the new position materially differs from the old one." Id. at 868

47

The defendant also cites to three Seventh Circuit cases. In Spring v. Sheboygan Area Sch. Dist., the plaintiff argued that "the public perceived [her transfer to a co-principal position] as a 'nudge towards retirement.'" 865 F.2d 883, 886 (7th Cir. 1989). The Seventh Circuit rejected the assertion that this constituted an adverse employment action, stating that "public perceptions were not a term or condition of Spring's employment." Id. In Flaherty v. Gas Research Inst., the plaintiff argued that under a proposed transfer his title would have changed from principal scientist to senior project manager, although his salary, benefits and level of responsibility would stay the same. 31 F.3d 451, 457 (7th Cir. 1994). The Seventh Circuit, citing Spring, stated that "[a]lthough the reporting relationship may have bruised Flaherty's ego, we indicated in *Spring* that a plaintiff's perception that a lateral transfer would be personally humiliating is insufficient, absent other evidence, to establish a materially adverse employment action." Id. In Crady, the Seventh Circuit found that although the plaintiff's responsibilities changed when he was reassigned to a different position, they were not less significant than the ones he previously had enjoyed. 993 F.2d at 136. The court concluded that Crady still would have been at management level and his salary and benefits would not have changed. Id.

There is a dispute between Rochon-Luft (who, along with the plaintiff, claims that the transfer connoted a loss in prestige) and Simon (who asserts that it did not). The cases cited by the defendant strongly imply that, on its

48

own, a subjective view that a transfer equates to a reduction in prestige is not sufficient to establish an adverse employment action.

But the plaintiff experienced more than an arguable decrease in the prestige of her position. She suffered a decrease in overall salary in her second year at the elementary school, and knew it was coming as part of the reassignment. The Seventh Circuit recognizes claims for materially adverse actions in "'cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished.'" Kurtzhals, 969 F.3d at 729 (citing O'Neal v. City of Chicago, 392 F.3d 909, 911 (7th Cir. 2004)). When the plaintiff was reassigned from the high school to the elementary school for the 2017-18 school year, Sebert amended her previous contract to allow her to work the same number of days for the same salary. Dkt. No. 23-33 at 1. It was not until the 2018-19 school year that the plaintiff's salary changed, decreasing from $110,460 to $91,720. Dkt. No. 22 at ¶8. This change in salary resulted from a change from a 260-day contract to a 211-day contract. Dkt. No. 26-1 at 70; dkt. no. 23-34 at 1. Although the plaintiff's *per diem* rate did not decrease between the 2017-18 and the 2018-19 school years due to the reduction in days worked, dkt. no. 26-1 at 63; dkt. no. 26-2 at 24, in the 2018-19 school year the plaintiff suffered a decrease in days worked resulting in a decrease in salary.

The defendant alleges that the plaintiff's salary did not decrease until after she filed her EEOC charge, which, the defendant argues, means that the plaintiff failed to exhaust her administrative remedies with regard to the

49

reduction. "[A] plaintiff filing suit in federal court 'may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." <u>Chaidez v. Ford Motor Co.</u>, 937 F.3d 998, 1004 (7th Cir. 2019) (citing <u>Geldon v. S. Milwaukee Sch. Dist.</u>, 414 F.3d 817, 819 (7th Cir. 2005)) (quotation marks omitted). "Claims are 'like or reasonably related' when (1) 'there is a reasonable relationship between the allegations in the charge and the claims in the complaint' and (2) 'the claim in the complaint can reasonably be expected to growth out of an EEOC investigation of the allegations in the charge." <u>Id.</u> (quoting <u>Cheek v. W. & S. Life Ins. Co.</u>, 31 F.3d 497, 500 (7th Cir. 1994)).

The defendant is correct that the plaintiff did not mention her salary decrease in her EEOC charge. But under these circumstances, the fact that her salary decreased is not a separate claim. Her EEOC charge included a claim of gender discrimination, dkt. no. 23-1 at 1, and her salary decrease relates directly to whether the plaintiff suffered an adverse employment action. The plaintiff was aware at the time she filed her EEOC charge that her salary for the 2018-19 school year would be reduced to reflect the decrease in work days. Dkt. No. 23-33 at 1.

The defendant insists that the plaintiff did not suffer a materially adverse employment action because her *per diem* rate did not change. But the court concludes that there is a genuine dispute over the material fact of whether the plaintiff was subjected to an adverse employment action when she was

50

transferred to a position with fewer work day, resulting in her annual compensation decreasing by nearly $19,000.

           d.       Favorable Treatment of Similarly Situated Employee

"'All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The similarly situated prong establishes whether all things are in fact equal.'" McDaniel v. Progress Rail Locomotive, Inc., 940 F.3d 360, 638 (7th Cir. 2019) (quoting Filar, 526 F.3d at 1061). "Although similarly situated employees 'need not be identical in every conceivable way,' they 'must be directly comparable to the plaintiff in all material respects.'" Id. (quoting Coleman, 667 F.3d at 846). "There must be 'enough common factors [] to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" Coleman, 667 F.3d at 847 (quoting Barricks v. Eli Lilly and Co., 481 F.3d 556, 560 (7th Cir. 2007)). The plaintiff must show at least that the comparator "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. (quoting Coleman, 667 F.3d at 846). This is "not a hard and fast test," but rather a "question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." Id. (quoting Johnson v. Advocate Health and Hospitals Corp., 892 F.3d 887, 895 (7th Cir. 2018)). The overall purpose of the analysis is to "eliminate other

51

possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." Coleman, 667 F.3d at 846 (quotation marks omitted).

The plaintiff argues that she was similarly situated to Steinbarth. The plaintiff had the same supervisor as Steinbarth—Sebert—and both were subject to the same evaluations. In their arguments on age discrimination, the parties do not address whether Steinbarth received better treatment from Sebert than the plaintiff, but their positions are implied in their arguments regarding "loss of prestige" and change in income. Because Steinbarth was expected to earn more money in the high school position than the plaintiff would earn at the elementary school position, and because of the dispute over the difference in prestige of the two positions, the court will accept for the purposes of summary judgment that Steinbarth was treated better than the plaintiff.

The heart of the issue is whether there is a genuine dispute over the similarity of Steinbarth and the plaintiff's circumstances. The two held the same titles at their respective schools. They had similar overall ratings in their annual evaluations by Sebert. The plaintiff received overall "effective" ratings all three years at the high school. Dkt. No. 26-9 at 8; dkt. no. 26-13 at 6; dkt. no. 26-14 at 14. Steinbarth received an overall rating of "effective" for the 2014-15 school year, dkt. no. 23-29 at 5, and "distinguished" for the 2015-16 school

52

year, dkt. no. 23-40 at 7. Both consistently received positive overall ratings for their work as principles prior to the reassignment.

But unlike Steinbarth, the plaintiff had received several "developing/needs improvement" ratings in her evaluations during her time as principal at the high school, specifically in the Leadership, Climate and Human Resources categories. Dkt. No. 26-9; dkt. no. 26-14. The high school also saw low school climate ratings over those three years, even compared to the rest of the district. Dkt. No. 23-24. As a result, the plaintiff was asked to create a plan for growth, with the aim of improving in these areas with the help of Sebert, Simon and Lewis. Steinbarth had no ratings of "developing/needs improvement" while serving as principal, dkt. no. 23-29, dkt. no. 23-40, and saw improved school climate ratings, dkt. no. 23-24.

Given the differences in their performance history, the plaintiff and Steinbarth are not similarly situated. The plaintiff has not identified a similarly situated individual with respect to her claim for age discrimination. She has not proven the fourth element of the McDonnell Douglas *prima facie* case.

e.    But-For Causation

Nor has the plaintiff shown that the difference in age is the "but for" cause of Sebert's decision—the standard she must meet under the ADEA. The plaintiff has provided no evidence showing that age played a factor in Sebert's decision-making. She relies on her assertion that Steinbarth was "significantly younger" than the plaintiff and that Steinbarth was part of a lunch club that did not include anyone under the age of fifty. No reasonable jury could

53

determine from these sparse facts that the defendant's decision to reassign the plaintiff from the high school to the elementary school was due to her age.

### 2. *Evidence Viewed as a Whole*

The evidence as a whole fails to demonstrate that the plaintiff's age was the but-for cause of her reassignment. The plaintiff was hired in the district on August 1, 2013, when she was fifty years old, beating out over seventy other candidates for the position of assistant principle at the high school. See dkt. no. 1 at ¶3. Sebert made the final decision to hire her for that position. Dkt. No. 26-3 a 5-6. The following year—presumably at age 51—the plaintiff interviewed for the principal position at the high school and Sebert gave her that position over twenty other candidates. Dkt. No. 26-2 at 7. He did so based on his belief that the plaintiff was good at building relationships, which was what the high school's culture needed at that time. Id. at 8.

The plaintiff had good evaluation scores from Sebert after the 2014-15 school year, her first year as principal, with "effective" or "distinguished" in all six categories and an overall rating of "effective." Dkt. No. 26-13. She was given a second contract that extended through the 2015-16 and 2016-17 school years, along with a salary increase. Dkt. No. 23-21. At the end of the 2015-16 school year, the plaintiff was again given an evaluation and received an overall rating of "effective." Dkt. No. 26-9. Again, however, this evaluation showed some problems, including three scores of "developing/needs improvement" in Leadership for Student Learning, School Climate and Human Resources Leadership. Id. Sebert asked the plaintiff to put together a plan for growth in

54

these three areas, dkt. No. 23-23 at 8, dkt. no. 26-2 at 11-12, and the district gave her another contract extending through the 2016-17 and 2017-18 school years, dkt. no. 23-25. The plaintiff received her third evaluation as principle at the end of the 2016-17 school year and problems remained. The plaintiff was given an overall rating of "effective" but received two "developing/needs improvement" grades in Leadership for Student Learning and School Climate. Dkt. No. 26-14. Sebert was dissatisfied with the plaintiff's growth in these areas as well as with the school climate surveys, which showed declining scores regarding the school's climate since the plaintiff had taken over as principal. Dkt. No. 26-2 at 15; dkt. no. 23-24. Sebert then decided to move the plaintiff to the principal position at Roberts Elementary, where he believed she would be a "better fit." Dkt. No. 26-2 at 15, 21.

It was around this time, in the spring of 2017, that Sebert asked Steinbarth if he would be interested in the high school principal position. Id. at 15. Although Steinbarth, who was ten years younger than the plaintiff, had less experience than the plaintiff in administrative positions, Sebert believed he would be a good fit. Id. at 10; dkt. no. 26-4 at 4; dkt. no. 22 at ¶4(l), (m). Steinbarth had been principle at Lakeshore Elementary during several years of improvement in its school culture. Dkt. No. 23-24. Sebert also invited Steinbarth to join the "lunch group" during this period. Dkt. No. 26-4 at 17; dkt. no. 26-7 at 1. As discussed, the parties dispute whether the group had any women in it; it is not clear whether they dispute the plaintiff's allegation that no one in the group was over the age of fifty. Dkt. No. 31 at ¶¶25-26.

55

Nowhere in all this evidence is there any that shows that Steinbarth was treated more favorably than the plaintiff *because* of his age. Again, the plaintiff's only allegations are that Steinbarth was ten years younger than the plaintiff and that he was part of Sebert's lunch group (which, she alleges, included only individuals under the age of fifty). Neither of those allegations, even if true, demonstrate that age was the but-for cause of the plaintiff's reassignment, particularly when one considers the plaintiff's performance reviews. The plaintiff has offered no evidence that Sebert or anyone else made negative comments about her age or pushed her to retire. Sebert transferred the plaintiff only three years after offering her the principal position. She was fifty when she was offered that position and likely was only fifty-three when she was transferred. No reasonable jury could find, based on the totality of the evidence, that the plaintiff's age was the but-for cause of her reassignment.

Because the plaintiff has not identified a similarly-situated individual sufficient to prove the fourth element of the McDonnell Douglas *prima facie* claim and because she has failed to show, under McDonnell Douglas or the totality of the evidence, that her age was the but-for cause of her reassignment, the court will grant the defendant's motion for summary judgment as to the plaintiff's ADEA claim.

D.     Analysis—Gender Discrimination

Title VII prohibits intentional discrimination in employment on the basis of statutorily proscribed factors, including sex. Joll, 953 F.3d at 929. "In discrimination cases, '[w]hen a defendant moves for summary judgment, the

56

"singular question" is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" Igasaki, 988 F.3d at 957. Title VII utilizes the same McDonnell Douglas and Ortiz analyses used in ADEA claims, with one exception. Rather than requiring that the plaintiff's gender be a "but-for" cause of the alleged discriminatory action, the Title VII analysis requires that gender be only a "motivating factor." Id. at 960.

               1.    *McDonnell Douglas* Framework

The court's analysis of the first three elements of the McDonnell Douglas *prima facie* case for gender discrimination under Title VII is the same as its analysis of those factors under the ADEA. The parties do not dispute that the plaintiff is a member of a protected class because of her gender. The "same actor" inference applies, but does not drive the analysis. There are genuine disputes as to whether the plaintiff was meeting her employer's legitimate expectations and whether being transferred to the elementary school constituted an adverse employment action. The questions remaining are whether the plaintiff has identified a similarly situated male who was treated more favorably than she and whether she has demonstrated that her gender was a motivating factor in the defendant's actions.

               a.    Similarly Situated Employee More Favorably Treated

The plaintiff has identified as comparators Steinbarth, Scottberg, Colwin and Schipper. With respect to Steinbarth, the plaintiff focuses solely on

whether he was treated more favorably than she, leaving out any specific argument as to why the two are similarly situated. See Dkt. No. 24 at 23. The court has concluded that, due to the differences in their performance histories, the plaintiff and Steinbarth were not similarly situated.

The plaintiff argues, citing Phelan, 347 F.3d at 684, that she has "shown background circumstances that demonstrate Sebert has a reason or inclination to discriminate invidiously against females or evidence that there is something 'fishy' about the facts at hand." Dkt. No. 24 at 24. She says that evidence of "fishiness" "could include facts that the men selected were not as qualified as the female making the claim," citing Preston v. Wis. Health Fund, 397 F.3d 539, 542 (7th Cir. 2005)). But she lifts her "fishiness" argument out of the context of the cases she cites. Phelan was a case of reverse discrimination—a Caucasian man who argued he'd been treated unfairly due to his race. The Phelan court stated:

> This court noted [in Mills v. Health Care Service Corp., 171 F.3d 450, 457 (7th Cir. 1999)] that in such cases of "reverse discrimination," the first prong of the *McDonnell* test cannot be used. *Id.* In its stead, a plaintiff must show "background circumstances" that demonstrate that a particular employer has "reason or inclination to discriminate invidiously against whites" or evidence that "there is something 'fishy' about the facts at hand." *Id.* at 455 (quoting *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)).

Phelan, 347 F.3d at 684. Preston, too, was a reverse discrimination case involving a male dentist who alleged that his former employer discriminated against him due to his gender. In stating that to raise a triable issue of discrimination, the male plaintiff needed to present "some evidence beyond the bare fact that a woman got a job that a man wanted to get or keep," the court

58

opined that one example of such evidence might be "[a] gross disparity in qualifications." <u>Preston</u>, 397 F.3d at 542.

This is not a case of reverse discrimination. The court *can* use the first element of the <u>McDonnell Douglas</u> *prima facie* case. The plaintiff *is* a member of a protected class, and the defendant does not dispute it. The "fishy" background circumstances upon which a plaintiff may rely in a reverse discrimination suit have no relevance here. Steinbarth is not similarly situated to the plaintiff, and the fact that he was in the "lunch club" does not demonstrate that he was.

Scottberg was an assistant principle at the high school for the 2016-17 school year before being reassigned to the principal position at the STEM school. Dkt. No. 23-6 at 23; dkt. no. 26-2 at 27. As the plaintiff asserts, Scottberg was scheduled to be paid more during the 2018-19 school year even though the two worked the same number of days. Dkt. No. 26-17 at 1. Although Scottberg earned less in his role as STEM school principal than the plaintiff had made as high school principal, <u>see</u> <u>id.</u>; dkt. no. 26-12 at 1, the pay difference for 2018-19 potentially implies favorable treatment. Scottberg also had been given a negative rating (needs improvement) on an evaluation prior to his promotion (although Sebert claims he did not know about that rating and Scottberg never was asked to create an improvement plan). Dkt. No. 26-2 at 27. A reasonable jury could find that Scottberg was treated favorably compared to the plaintiff.

59

The plaintiff does not provide any details, however, as to how she and Scottberg were similarly situated, focusing solely on Scottberg's allegedly more favorable treatment. A review of the evidence shows that the plaintiff and Scottberg had different supervisors. The plaintiff's supervisor was Sebert, whereas Scottberg's supervisor was the plaintiff while he was assistant principal at the high school and received the negative rating,. Dkt. No. 26-2 at 27. At the time the two received negative evaluation scores, the plaintiff was the principal of the high school and was expected to elevate the school's culture. See dkt. no. 26-2 at 8. Scottberg was an assistant principle, and the parties have not provided any information regarding the defendant's expectations of him in that role. Scottberg had only one negative evaluation score, dkt. no. 26-2 at 27, and there is no evidence in the record that he was ever placed on a growth or improvement plan. The plaintiff and Scottberg were not similarly situated.

While the plaintiff focused solely on more favorable treatment with Scottberg, she does the opposite and focuses solely on "similarly situated" with Colwin. Colwin was the principal at Pier Elementary School before Sebert moved him to an assistant principal position at Sabish Middle School. Dkt. No. 22 at ¶4. Rochon-Luft testified at her deposition that Colwin was "allowed to get away with anything short of murder," presumably referring to the complaint about Colwin attempting to get into a student's home. Dkt. No. 26-6 at 15, 29. Even if the court were to accept the plaintiff's unsupported assertion that Colwin was subject to termination, see dkt. no. 24 at 25, the plaintiff's

60

allegations (and the evidence) would, at best, demonstrate that both Colwin and the plaintiff were having performance problems—that they might have been similarly situated. The plaintiff has not demonstrated that Colwin received more favorable treatment than she. In fact, the opposite appears to be the case—Colwin was transferred from a principal position to an assistant principal position, while the plaintiff was transferred to another principal position. The plaintiff has not demonstrated that Colwin is a similarly situated employee who received more favorable treatment than she.

Finally, the plaintiff compares herself to Schipper, who had been the principal at Riverside Elementary before Sebert reassigned him to the principal position at Woodworth Middle School on July 2, 2018. Dkt. No. 22 at ¶4. In the 2011-12 school year, Riverside Elementary was qualified by the Department of Public Instruction (DPI) as a "Focus School." Dkt. No. 26-2 at 11; Dkt. No. 29 at ¶9. Sebert described this to mean that the academic performance at the school had hit a point at which the state steps in to provide additional resources and to help develop a plan to remedy the problems. Dkt. No. 26-2 at 11. It is unclear when Schipper was hired as principal at Riverside. Sebert makes conflicting statements about whether or not the elementary school was still on the DPI's list during the 2017-18 school year—the year before Schipper was reassigned to the middle school. In his deposition, Sebert was asked whether the elementary school was "at least put on as a Focus and Priority school for the 2017-18 school year," to which Sebert answered "[t]o my recollection, yes." Id. Later, he signed a declaration stating that the school "had

61

made the necessary improvement and was no longer designated as a Focus School when I reassigned Mr. Schipper to Woodworth in 2018," and he denied that Riverside still was qualified as a Focus school in 2017. Dkt. No. 29 at ¶9. This leaves a genuine dispute of fact over whether Riverside Elementary was designated as a Focus school the year before Sebert reassigned Schipper, its principal, to the principal position at the middle school.

A reasonable jury could determine that Schipper was similarly situated to the plaintiff, a principal at a struggling school prior to being reassigned to the middle school. There is a genuine dispute of material fact over the timing of the elementary school's release from "Focus School" designation. There is a genuine dispute of fact over whether reassignment from principal of a high school to principal of an elementary school is an adverse employment action; arguably being transferred from an elementary school to a middle school could be considered a "promotion" in contrast to the plaintiff's "demotion," showing that Schipper was treated favorably compared to the plaintiff (although the parties point to no evidence to that effect).

Of the four males the plaintiff identifies, Schipper *could be* a similarly situated male who *might have been* more favorably treated than the plaintiff.

### b. Motivating Factor

To prove that her gender was a motivating factor for Sebert's decision to reassign her, the plaintiff relies on what she believes is Sebert's habit of showing favoritism toward men in the district.

The plaintiff first points to the lunch group. There is a dispute of fact over the gender demographics of this group. Sebert testified at his deposition that the group was comprised of "Don Smith, Dave Michalkiewicz, Dan Hebel, [himself], and Matt Steinbarth"—all males. Dkt. No. 26-2 at 14. Lewis, a female, stated at her deposition that she had joined the group on one or two occasions. Dkt. No. 26-5.

The plaintiff argues that Sebert showed favoritism to Smith, Michalkiewicz and Steinbarth as members of the lunch group. The plaintiff's allegation that Smith got a "promotion" and a "big raise" are not supported by evidence. His raise was modest (somewhere between $900 and $1,800, depending on the year the plaintiff is speaking about), and his promotion to the principal position at the STEM Academy came in 2013, over a year before Sebert was aware of his affair. Dkt. No. 30 at ¶¶2-3. The plaintiff cannot point to Smith as evidence that men were generally treated more favorably than women despite improper conduct or bad performance.

As to Michalkiewicz, the evidence shows that it was standard practice for the superintendent to evaluate the athletic director at the high school, going back before the plaintiff was hired, when her position was occupied by a male. Dkt. No. 29 at ¶5. The plaintiff evaluated the female fine arts director, who also was an assistant principal at the high school. Id. at ¶5. The fact that Sebert evaluated Michalkiewicz does not show favoritism toward males; the plaintiff performed evaluations for Scottberg when he was an assistant principle at the high school. The plaintiff's contention that Michalkiewicz provided the same

63

evidence for his documentation log as the plaintiff does not demonstrate favoritism. The plaintiff herself stated in her deposition that there were three other "pieces of evidence" used in the evaluations in addition to documentation logs, dkt. no. 26-1 at 25, so the plaintiff cannot prove that one of those other types of evidence did not result in Michalkiewicz being treated differently than the plaintiff.

And the evidence shows that Steinbarth was given the position at the elementary school over Dorn because Dorn had made a false statement during her application and interview process. Sebert was not overriding the other decisionmakers, as the plaintiff suggests. The plaintiff's understanding that Steinbarth submitted his documentation log after the deadline is not supported by the evidence. The plaintiff is wrong that the documentation log was due in October 2017; the evidence shows that the documentation log was due in May 2018, dkt. no. 33-5 at 29, and the plaintiff acknowledged that Steinbarth submitted his documentation log on March 18, 2018, dkt. no. 26-1 at 66. The plaintiff's statement that Steinbarth made more than she had while in the high school principal position does not show favoritism because the plaintiff, as a female, became the highest paid principal in the district (of any gender) when she became high school principal. Dkt. No. 22 at ¶8; Dkt. No. 26-1 at 21; Dkt. No. 26-12 at 1. This includes making more than her male predecessor. Dkt. No. 26-12 at 1.

The plaintiff makes the same arguments about Scottberg and Schipper that the court already has discussed. Schipper is the only male who arguably,

64

may have been situated somewhat similarly to the plaintiff and arguably, may have been treated more favorably than the plaintiff. The fact that Sebert may have treated one, similarly situated male more favorably than one female does not show a pattern of favoritism, or of generally treating males more favorably than females.

>    2.    *Evidence Viewed as a Whole*

The court's conclusion is no different when it views the evidence as a whole. At bottom, the plaintiff has demonstrated only that a single male employee may have been similarly situated to her and may have been treated more favorably than she. Under any analytical framework, that is not sufficient to allow a jury to conclude that the plaintiff's gender was a motivating factor in Sebert's decision to transfer her to the elementary school.

>    3.    *Conclusion*

The plaintiff has not provided any other evidence or argument of gender favoritism. Based on the record evidence, no reasonable jury could find that her reassignment was motivated by gender. The court will grant the plaintiff's motion for summary judgment as to the plaintiff's Title VII claim for gender discrimination.

>    E.    Constructive Discharge

Finally, the defendant argues that the plaintiff cannot bring a constructive discharge claim. Dkt. No. 20 at 22. The defendant asserts that in the EEOC charge she filed prior to filing the federal lawsuit, the plaintiff did not include any claims relating to constructive discharge. Id. at 23. It argues that

this failure bars that claim in federal court unless the claim is reasonably related to or growing out of the claims made in the charge. Id. at 22 (quoting Geldon, 414 F.3d at 819).

The defendant asserts that "[i]n the context of a constructive discharge claim, especially where the resignation decision occurred after the EEOC charge had been filed, a constructive discharge claim cannot be 'like or reasonably related' to the EEOC charge." Id. at 23 (discussing Herron v. DaimlerChrysler Corp., 388 F.3d 293 (7th Cir. 2004)). It maintains that the plaintiff resigned from her position after she filed her EEOC charges. Id. at 24. It also says that the EEOC charge does not reference the plaintiff's retirement decision. Id.

The plaintiff responds that her claim for constructive discharge is reasonably related to her discrimination claims. Dkt. No. 24 at 25-26. She says that she lost future wages due to her salary decrease and the fact that Steinbarth was paid more than she had been at the high school. Id. at 26. She argues that she was forced to leave the district due to problems with the EBD (emotional and behavioral disorder) classroom at Roberts Elementary. Id. at 27. According to the plaintiff, the defendant was not responsive when she and her staff asked for additional support to help with the EBD students. Id. The plaintiff says she was unable to mitigate her circumstances after leaving the district because of her fear that Sebert would provide negative references, as he allegedly had for Rochon-Luft. Id. at 28.

66

The parties' arguments are perplexing. The eleven-page complaint does not mention constructive discharge. It contains no claim of constructive discharge. It does not mention the plaintiff's retirement or the termination of her employment in any way. Nowhere within the complaint does the plaintiff use the word "constructive," "discharge" or "retire." The plaintiff's allegations of constructive discharge appear for the first time in her proposed findings of fact. Dkt. No. 31.

But even if the plaintiff had stated a claim for constructive discharge, she did not raise that claim in her EEOC charge. The EEOC charge does not mention any details of a constructive discharge. The plaintiff herself emphasizes that she filed the EEOC charge *before* she left the district. The facts of this case are similar to the facts in <u>Herron</u>, 388 F.3d at 303, in which the Seventh Circuit affirmed the district court's grant of summary judgment on the plaintiff's constructive discharge claim (based on hostile work environment), noting that "Herron was obviously not pleased with his situation at DaimlerChrysler, but he left voluntarily several months after filing his last EEOC complaint and after having secured a comparable job elsewhere." The plaintiff did not secure a comparable job elsewhere, but she did voluntarily leave the district after filing her EEOC charge.

Perhaps even more to the point, the plaintiff argues in opposition to summary judgment that her constructive discharge claim is related to her discrimination claims, but she also argues that she retired because of the lack of support in the EBD classroom. Whether there was sufficient support in the

67

EBD classroom at the elementary school has nothing to do with whether the plaintiff suffered adverse employment actions at the high school due to her gender or her age.

The scope of the plaintiff's EEOC charge does not include constructive discharge. Her complaint does not allege constructive discharge. Her own arguments do not support a claim for constructive discharge. The defendant is entitled to summary judgment as to that claim.

**III. Conclusion**

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 19.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 27th day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

68